[No. 42073.    En Banc.    January 20, 1972.]

ROBERT HARRIS OSBORN, *as Executor, Appellant,* v. PUBLIC HOSPITAL DISTRICT 1, *Respondent.*

*Lloyd D. Cunningham* and *C. E. Hormel,* for appellant.

*Hughes, Jeffers & Jeffers,* by *Garfield R. Jeffers,* for respondent.

HUNTER, J.—This appeal results from the trial court's dismissal of the plaintiff's action for the insufficiency of the evidence to establish a prima facie case, at the close of the plaintiff's case in a jury trial.

The plaintiff (appellant), Omer H. Osborn, an 84-year-old man, was a patient in Samaritan Hospital at Moses Lake, owned and operated by Public Hospital District No. 1

for Grant County, Washington, who was alleged to have fallen from a bed in defendant's (respondent's) hospital and sustained injuries for which the plaintiff sought to recover. The plaintiff was admitted to the hospital about 12 noon on December 10, 1968. The injuries occurred about 5 o'clock the following morning. The plaintiff died on March 18, 1970, prior to the trial of the case, and the executor of his estate, Robert H. Osborn, was substituted as party plaintiff.

Omer H. Osborn alleged in his complaint that the injuries he sustained were proximately caused by the negligence of the defendant, in that the defendant hospital district, through its agents and employees, failed to raise the side rails on the hospital bed on which the plaintiff had been placed, and in that the defendant had "wrongfully and negligently failed to give the proper attention, care, observation and consideration to plaintiff's medical needs, well being, and condition."

Omer H. Osborn was admitted to the defendant's hospital on December 10, 1968, for a bowel condition, acute bronchitis and pneumonia. The services of his attending physician, Dr. James W. Young, terminated shortly after the accident and he was succeeded by Dr. Robert H. Ruby who testified from the hospital notes as to the attention and medication the plaintiff received during the period from the time of his admission at 12 noon, December 10th, until the time of his accident at about 5 o'clock the following morning.

The records show he was placed on a regime whereby his every urination was subject to urinalysis, a blood test was ordered, a diet ordered and the periodic giving of a narcotic or drug called "demerol." Demerol was prescribed for given intervals of every 3 to 4 hours. Dr. Ruby described it as a synthetic narcotic drug, a substitute for morphine, and was given for pain. Its effect on some persons was to cause drowsiness.

Dr. Ruby testified that the hospital notes stated demerol was administered to Mr. Osborn on December 10th at 2 p.m., 5 p.m., 8 p.m., and 11 p.m. Nurse Martin testified that

on December 11th she had administered 50 milligrams of demerol at 2:45 a.m., and again at 5:30 a.m., after his fall.

The hospital notes showed no limitation on bathroom privileges which was understood by custom to mean a patient may get up and go to the bathroom without assistance. However, the hospital notes further show that Mr. Osborn voided in a receptacle from which it could be inferred was during the time the bed rails were up prior to 5 a.m. on December 11th.

Mrs. Bea Johnson, the director of nursing services for the hospital, testified that the defendant's general hospital policy with elderly people was to put the bed rails up at night and, where a patient has bathroom privileges, to put bed rails down some time around 5 a.m. for morning care.

Mrs. Frances Martin, a registered nurse, testified that Mr. Osborn's mental condition was fine and he was not confused or disoriented at 2:45 a.m. when given a dosage of demerol. She further testified giving an oral antibiotic at 4 a.m. on the morning of December 11th, at which time he was reasonably rational and alert. A Miss Wentland lowered the bed rails and placed the bed in a low position at approximately 5 a.m. for the customary morning care. Shortly thereafter the plaintiff was found on the floor of his room.

Nurse Martin testified that upon finding him seated on the floor she asked him what had happened and he replied he had gotten up to go to the bathroom and that he fell; that he did not say anything about having fallen or rolling out of bed. She testified she had on previous occasions administered minimal dosages of demerol and that he had no difficulty handling it. On cross-examination, she testified Mr. Osborn was not confused or disoriented when he had sustained his fall. However, upon getting him back to bed, Nurse Martin testified as follows:

A. I questioned him regarding if he was having any pain from the fall. Q. What did he tell you? A. *And he said—he had first said, no, when I asked him if his leg or hip or arm was hurt—he first said, no, and then he would*

*say, yes, and then, no, and then, yes. And he couldn't really decide whether he was having pain or not.*

(Italics ours.)

X rays taken that morning showed he had a fractured left hip. This had not healed at the time of his death approximately 1 year and 4 months later.

The plaintiff contends the trial court erred in finding the plaintiff had failed to establish a prima facie case of negligence on the part of the hospital for the reason that it based this conclusion primarily on the erroneous ground that the duty of care for the patient's safety was placed upon the attending physician rather than the hospital.

The trial court stated:

And it appears to the court that the actions of the nurse at the time, in the morning, that the bed rail was put down, when the A.M. morning activities started in the hospital, *is right in accordance with the doctor's orders. . . .* But, the actions of the nurses and the people who run the hospital have been pretty well examined, and there has been no showing before the Court of any negligence on the part of the hospital, when you consider the matter in the light of the doctor's orders.

. . .

Well, *again I state that I am relying very strongly on Dr. Ruby's testimony where he stated that the bed rails were put down, if bathroom privileges were allowed, about 5:00 a.m., and that generally the policy is to follow the doctor's orders.* "If the doctor did not otherwise order it, a patient has bathroom privileges."

(Italics ours.)

The plaintiff cites RCW 70.41, containing the hospital licensing law of the State of Washington which, in the declaration of purpose, states that the primary purpose of this chapter is to promote safe and adequate care of individuals in hospitals "through the development, establishment and enforcement of minimum hospital standards for maintenance and operation." To accomplish these purposes, RCW 70.41.010 provides:

(3) The establishment by the state board of health of

standards, rules and regulations for the construction, maintenance and operation of hospitals;

(4) The enforcement by the Washington state department of health of the standards, rules and regulations established by the board.

The Washington Administrative Code, WAC 248-18-200(7), of which this court can take judicial notice, provides as follows:

The hospital shall establish safety policies and procedures for the care of the patients who because of their age or condition are not responsible for their acts.

Clearly, as argued by the plaintiff, it appears that the hospital by statute has a duty of care for the safety of its patients, independent of the care that may be chargeable to a patient's attending physician.

The reason for this is peculiarly illustrated by the facts of this case. The attending physician here having observed Omer H. Osborn at 12 noon on December 10th, did not have the advantage of observing his patient thereafter at 5 o'clock the following morning after he had received at intervals five injections of 50 milligrams of demerol before the patient's accident. Under these circumstances, it would appear unreasonable to say the hospital attendants who had the opportunity to observe the mental condition of this weak and ill 84-year-old man the following morning, could blindly follow the implied direction of the doctor (according to custom and practice) for the patient to have bathroom privileges, and be relieved of any responsibility for this patient's physical safety in the administering of this care.

Assuming it could have, as a fact, been reasonably determined by the nurses administering morning care that the elderly plaintiff was confused and might be in need of assistance for his personal toilet needs, liability of the defendant for damages resulting from failure to furnish that assistance could not be avoided by relying upon the doctor's observation of 12 noon the day before.

We hold there was a responsibility of the hospital

attendants to administer to the physical safety of this patient as their reasonable observation of Omer H. Osborn's state of mind and physical condition at that time would reveal, independent of the implied direction from the attending physician as of the day before.

From this record the jury would be entitled to consider a probable inconsistency in Nurse Martin's testimony by reason of her stated opinion that Mr. Osborn was not confused or disoriented, when she had knowledge of his indicated confusion as to his suffering pain at the time he had sustained a fracture of his left hip.

The jury, from this record, could have concluded that reasonable prudence for Mr. Osborn's safety would have required the bed rails to have remained raised and assistance given Mr. Osborn in the exercise of his bathroom needs.

The defendant cites *Adams v. State,* 71 Wn.2d 414, 429 P.2d 109 (1967); *Benjamin v. Havens, Inc.,* 60 Wn.2d 196, 373 P.2d 109 (1962); *Roth v. Havens, Inc.,* 56 Wn.2d 393, 353 P.2d 159 (1960), which we have considered and find to be distinguishable on the facts.

■ The defendant argues we should not consider RCW 70.41 regarding safety standards of hospitals and rules adopted pursuant thereto since they were not brought to the attention of the trial court, and were raised for the first time on appeal. We disagree. The issue of the hospital's duty for the safety of its patients was squarely before the trial court and the statutes of this state in regard thereto are therefore pertinent to our consideration.

■ Giving the testimony the most favorable inferences to the plaintiff, as we must in considering a motion for dismissal for the insufficiency of the evidence, *Hayes v. Hulswit,* 73 Wn.2d 796, 440 P.2d 849 (1968); *Smith v. B & I Sales Co.,* 74 Wn.2d 151, 443 P.2d 819 (1968), we hold there was a jury question as to the issue of the defendant's negligence in caring for the plaintiff, Omer H. Osborn, at the time of his accident, and that the trial court erred in dis-

missing the plaintiff's action at the conclusion of the plaintiff's case.

The trial court's order is therefore reversed and the case is remanded for a new trial. Costs will abide the final determination of the cause.

HAMILTON, C.J., FINLEY, ROSELLINI, HALE, and STAFFORD, JJ., concur.

NEILL, J. (dissenting)—I see no distinction between the facts which we held insufficient to support a jury verdict for plaintiff in *Roth v. Havens, Inc.*, 56 Wn.2d 393, 353 P.2d 159 (1960), and the facts adduced by the evidence in this case. The difference in the facts in these two cases is not of legal significance when applied to the principle of law here involved.

The liability of a hospital is properly delineated in *Roth, supra,* wherein we stated at page 396:

> Certainly a hospital is not an insurer of a patient's safety. *McDonald v. Foster Memorial Hospital,* 170 Cal. App. (2d) 85, 338 P. (2d) 607; *Gray v. Carter,* 100 Cal. App. (2d) 642, 224 P. (2d) 28; *Sylvester v. Northwestern Hospital of Minneapolis,* 236 Minn. 384, 53 N. W. (2d) 17; *Simmons v. South Shore Hospital,* 340 Ill. App. 153, 91 N. E. (2d) 135; *Maki v. Murray Hospital,* 91 Mont. 251, 7 P. (2d) 228; 41 C. J. S. 341, 349, 350, § 8.
>
> *Cochran v. Harrison Memorial Hospital,* 42 Wn. (2d) 264, 254 P. (2d) 752, states the general standard of care as follows:
>
> " 'It is not disputed that all the authorities hold that private hospitals owe to their patients such ordinary care and attention as the mental and physical condition of such patients reasonably requires. The law demands reasonable care, such care as a reasonable man would take under the circumstances existing, but no man is required to take measures against a danger which the circumstances as known to him do not suggest as likely to happen.' "
>
> Respondent contends the fact that the nurse momentarily left respondent alone on the bed with the bed rails down constituted a breach of the duty of care owed the respondent. Such itself is not proof of negligence. There must be proof that respondent was in such a condition,

which was known or should have been known by the nurse, that reasonable care under the circumstances required raised bed rails.

It would be only speculation to find that Mr. Osborn was in such physical or mental condition at 5 a.m. of the morning of his fall to place the hospital employees on notice that it would be unsafe to leave Mr. Osborn's bed rails down for his morning care. Incidentally, Mr. Osborn apparently did not fall out of the bed, but fell after he had gotten out of bed and was proceeding to the bathroom.

The testimony quoted by the majority, when taken in immediate context with the related testimony of the quoted witness,[1] does not tend to establish, directly or by any rea-

---

[1] "Q. Mrs. Martin, the records also indicate that at 5:30 a.m., that morning, which was after the accident, you gave Mr. Osborn another shot of Demerol, is that right? A. Right. Q. And was this in fact after the accident? A. Yes. Q. And about what time was the accident, approximately? A. It was right at 5:00 or around there. Q. Now, from your personal observation, this elderly gentleman sustained this fall, and you gave him Demerol shortly, within a maximum of half an hour afterwards, was he confused or disoriented at that time? A. No. Q. Was he alert? A. Yes. Q. Was he rational? A. Yes. Q. Did he make any statements to you? What did he tell you? A. When we asked him what had happened he told us that he - - - [Colloquy] A. I think it was prior to this, prior to me giving him the shot, that he told us—it's when we had got him back into bed, we asked him what had happened, and he said that he'd gotten up - - - MR. CUNNINGHAM: Objection, she said "we." THE COURT: Objection overruled. Q. (BY MR. JEFFERS) Go ahead. A. He told us—we were all in the room still, he told us that he had gotten up to go to the bathroom and he fell. Q. And did you then, being the medicine nurse, did you ask him if he wanted Demerol, or did you decide he should have Demerol, or what were the circumstances? A. I questioned him regarding if he was having any pain from the fall. Q. What did he tell you? A. And he said—he had first said, no, when I asked him if his leg or hip or arm was hurt—he first said, no, and then he would say, yes, and then, no, and then, yes. And he couldn't really decide whether he was having pain or not. Q. And is this why you decided to give him the Demerol? A. Yes. Partly because of the possibility of him actually having pain, and also it would tend to kind of settle him down from the reaction of the fall. Q. So, you, in fact, did give him 50 milligrams of Demerol at approximately 5:30? A. Right. Q. And he was alert at this time, as I understand it? A. Right. Q. He told you that he fell when he was getting up to go to the bathroom? A. He said he has gotten up to go to the bathroom and fell. Q. He was already up? A. Right. Q. He didn't say anything about having fallen out of bed or rolled out of bed? A. No."

sonable inference, that Mr. Osborn was disoriented or confused at the time the attendant lowered the bed rails for morning care. The record does not otherwise contain evidence that the hospital's normal operating procedures were unreasonable nor that the condition of Mr. Osborn was such as to require the hospital to use more stringent supervision or procedures.

It is the function of the trial court presented with a challenge to the sufficiency of the evidence to determine whether the evidence, viewed most favorably to the plaintiff, will support a reasonable inference of negligence. The court properly ruled that the evidence did not meet this test. I would affirm his holding.

WRIGHT, J., concurs with NEILL, J.