[No. 49751–6. En Banc. February 16, 1984.]

RUDOLFO PEDROZA, *Individually and as Administrator, Appellant,* v. BEN BRYANT, *Defendant,* SKAGIT VALLEY HOSPITAL, *Respondent.*

STAFFORD, J., and DORE, J., who disqualified himself after oral argument, did not participate in the disposition of this case.

*Daniel F. Sullivan* and *Thomas R. Golden,* for appellant.

*Williams, Lanza, Kastner & Gibbs,* by *Daniel E. Tolfree* and *William H. Robertson,* for respondent.

*Paul N. Luvera, Jr.,* amicus curiae for appellant.

*Walter Walkinshaw* on behalf of Washington State Hospital Association, amicus curiae for respondent.

PEARSON, J.—The issue before us is whether a hospital may be held liable under a theory of corporate negligence for its action in granting privileges to a nonemployee doctor who allegedly commits malpractice while in private practice off the hospital premises.

In December of 1978, Maria Pedroza was in her 35th week of pregnancy and under the care of Dr. Ben Bryant. During the week of December 3 through 9, Maria became ill and exhibited the classical symptoms of preeclampsia (a toxemia of pregnancy), namely, hypertension, headaches, and edema of the lower extremities. Mrs. Pedroza visited Dr. Bryant's office on December 6 and 7, and telephoned him on December 8. Dr. Bryant prescribed no medicine other than bed rest and aspirin. He did not refer Mrs. Pedroza to another health care provider.

On December 9, 1978, Maria Pedroza was admitted, comatose, to defendant Skagit Valley Hospital. She was admitted to surgery, with a diagnosis of irreversible cerebral death due to intracerebral hemorrhage resulting from eclampsia. Dr. Bryant was neither the admitting nor the treating physician for this hospitalization. Indeed, the hospital had, on April 13, 1977, limited Dr. Bryant's obstetrical

and newborn privileges to Class II for the years 1977 and 1978. Dr. Bryant was thus required to consult with a Class I physician on all "seriously ill patients," including pregnancies with "major medical complications" and "[l]ate or severe toxemia of pregnancy." Thus, Dr. Bryant would not have been allowed to treat Maria Pedroza for eclampsia in the hospital.

In surgery, Mrs. Pedroza's child was successfully delivered by emergency cesarean section. After family consent was obtained, respiratory support for Mrs. Pedroza was discontinued on December 15, 1978, whereupon she died.

Plaintiff Rudolfo Pedroza was Maria's husband, and is administrator of her estate. He brought a malpractice action against Dr. Bryant, and further alleged that defendant Skagit Valley Hospital was negligent in that it violated a duty of care owed Maria Pedroza to grant hospital admitting and treating privileges only to those physicians who are competent. Defendant hospital moved for summary judgment dismissing plaintiff's claims against it. The motion was granted on July 15, 1981. The basis for the trial judge's ruling, as set forth in his oral decision, was that: (1) the theory of hospital corporate negligence relied on by plaintiff is not recognized in Washington, and (2) even if it were, the theory does not extend to acts done outside the hospital.

I

The essential elements of actionable negligence are: (1) the existence of a duty owed to the complaining party; (2) a breach thereof; (3) a resulting injury; and (4) a proximate cause between the claimed breach and resulting injury. *Hansen v. Washington Natural Gas Co.,* 95 Wn.2d 773, 776, 632 P.2d 504 (1981). The threshold determination of whether defendant owed Mrs. Pedroza a duty with respect to the competency of its staff physicians is a question of law. *Peterson v. Pacific First Fed. Sav. & Loan Ass'n,* 23 Wn. App. 688, 692, 598 P.2d 407 (1979). In arguing that such a duty exists in Washington, plaintiff urges

the court to apply a theory of corporate negligence.

It should be noted at the outset that plaintiff is not claiming that defendant hospital is vicariously liable for the negligence of Dr. Bryant under the theory of respondeat superior. Dr. Bryant is an independent contractor, not an employee of defendant hospital. Plaintiff is instead relying solely on the doctrine of corporate negligence, which differs from respondeat superior in that it imposes on the hospital a nondelegable duty owed directly to the patient, regardless of the details of the doctor–hospital relationship. Plaintiff contends that defendant hospital owed a duty to Maria Pedroza of carefully selecting and reviewing the competency of its staff physicians. ("Staff physicians" are those doctors who have been given "staff privileges" at the hospital. A physician must be a member of the hospital's medical staff in order to regularly admit patients to the hospital.) Plaintiff alleges that defendant hospital breached this duty by allowing Dr. Bryant to possess staff privileges at the hospital, and that this breach was the proximate cause of Mrs. Pedroza's death.

## II

The first question we must address, then, is whether the doctrine of corporate negligence applies to hospitals in Washington. The doctrine of corporate negligence appears to have been introduced in *Darling v. Charleston Comm'ty Mem. Hosp.*, 33 Ill. 2d 326, 211 N.E.2d 253 (1965), where the Illinois Supreme Court found defendant hospital liable for its failure to review the plaintiff–patient's treatment and require consultation with appropriate medical staff members as needed. This established the concept that a hospital had an independent responsibility to patients to supervise the medical treatment provided by members of its medical staff. Liability for failure to do so was not founded on respondeat superior, which had been the traditional mode of recovery; rather, the court found the hospital liable for its own negligence and not that of the physician.

The doctrine of corporate negligence has since been utilized by courts to require hospitals to exercise reasonable care to insure that the physicians selected as members of hospital medical staffs are competent. *See Johnson v. Misericordia Comm'ty Hosp.*, 99 Wis. 2d 708, 301 N.W.2d 156 (1981); *Ferguson v. Gonyaw*, 64 Mich. App. 685, 236 N.W.2d 543 (1975); *Corleto v. Shore Mem. Hosp.*, 138 N.J. Super. 302, 350 A.2d 534 (1975); *Mitchell Cy. Hosp. Auth. v. Joiner*, 229 Ga. 140, 189 S.E.2d 412 (1972). Jurisdictions adopting corporate negligence have also held that hospitals have a continuing duty to review and delineate staff privileges so that incompetent staff physicians are not retained. *See Purcell v. Zimbelman*, 18 Ariz. App. 75, 500 P.2d 335 (1972); *Moore v. Board of Trustees*, 88 Nev. 207, 495 P.2d 605 (1972). (For other jurisdictions adopting corporate negligence, *see Elam v. College Park Hosp.*, 132 Cal. App. 3d 332, 183 Cal. Rptr. 156 (1982); *Bost v. Riley*, 44 N.C. App. 638, 262 S.E.2d 391 (1980); *Kitto v. Gilbert*, 39 Colo. App. 374, 570 P.2d 544 (1977); *Utter v. United Hosp. Ctr., Inc.*, 236 S.E.2d 213 (W. Va. 1977); *Gridley v. Johnson*, 476 S.W.2d 475 (Mo. 1972); *Foley v. Bishop Clarkson Mem. Hosp.*, 185 Neb. 89, 173 N.W.2d 881 (1970).)

Before the emergence of corporate negligence, hospital liability for the negligence of a staff physician was based on the theory of respondeat superior. Plaintiffs found it difficult to recover, however, as courts tended to classify physicians as independent contractors for whose acts the hospital was not liable. Some states, Washington among them, have attempted to avoid the somewhat artificial distinctions associated with the independent contractor defense (*e.g.*, classifying an independent private physician with staff privileges who is retained by the patient as an "independent contractor" while a physician whose salary is paid by the hospital is a "servant," even though both are on the same medical staff, performing the same tasks). They have tried to avoid these distinctions by affixing vicarious liability upon the hospital when the individual is performing an

"inherent function" of the hospital, or acting as an "ostensible agent." *See Adamski v. Tacoma Gen. Hosp.,* 20 Wn. App. 98, 579 P.2d 970 (1978). Such an analysis does not, however, address the question of the hospital's direct negligence in its selection or retention of an incompetent doctor on the hospital's medical staff.

The doctrine of corporate negligence reflects the public's perception of the modern hospital as a multifaceted health care facility responsible for the quality of medical care and treatment rendered. The community hospital has evolved into a corporate institution, assuming "the role of a comprehensive health center ultimately responsible for arranging and co–ordinating total health care." Southwick, *The Hospital as an Institution—Expanding Responsibilities Change Its Relationship with the Staff Physician,* 9 Cal. W. L. Rev. 429 (1973). The patient treated in such a facility receives care from a number of individuals of varying capacities and is not merely treated by a physician acting in isolation. In *Moore v. Board of Trustees,* 88 Nev. at 211–12, the Nevada Supreme Court recognized the expanding role of the hospital:

> Today, in response to demands of the public, the hospital is becoming a community health center. The purpose of the community hospital is to provide patient care of the highest possible quality. To implement this duty of providing competent medical care to the patients, it is the responsibility of the institution to create a workable system whereby the medical staff of the hospital continually reviews and evaluates the quality of care being rendered within the institution. . . . The role of the hospital vis–a–vis the community is changing rapidly. The hospital's role is no longer limited to the furnishing of physical facilities and equipment where a physician treats his private patients and practices his profession in his own individualized manner.

This increased public reliance upon hospitals favors adoption of corporate negligence.

Hospitals are also in a superior position to monitor and control physician performance.

Since it is estimated that seventy–five to eighty percent of all medical malpractice claims arise in hospitals, the institution is the logical starting place for addressing problems of professional incompetence. Furthermore, the hospital is in a position superior to that of state licensing boards, professional organizations, and the PSRO [Professional Standards Review Organizations] program to monitor and control physicians' medical performance. Professional practices can be observed on a regular basis at the site where care is being rendered. Deviations from "good" medical practice should be readily apparent at an early stage when preventive measures can be undertaken by the hospital to protect patients from possible injury. Early detection also enables the hospital to institute informal procedures which may adequately correct a problem before more formal sanctions are necessary. The availability of an organized medical staff allows the hospital to benefit from professional medical judgment necessary to assess the quality of care delivered by other physicians. Moreover, the reluctance of the medical staff members to report the poor practices of a fellow member may be overcome if the disciplinary sanctions include intermediate steps. In addition, the elaborate department and committee structure of the medical staff, dictated by JCAH [Joint Commission on Accreditation of Hospitals] standards, state health regulations, or the hospital's own bylaws, provides a means to conduct ongoing and periodic review of the care rendered by all physician staff members.

(Footnotes omitted.) Koehn, *Hospital Corporate Liability: An Effective Solution to Controlling Private Physician Incompetence?*, 32 Rutgers L. Rev. 342, 376–77 (1979).

Forcing hospitals to assume responsibility for their corporate negligence may also provide those hospitals a financial incentive to insure the competency of their medical staffs. The most effective way to cut liability insurance costs is to avoid corporate negligence.

While this court has not expressly adopted the theory of corporate negligence, it has recognized and adopted the fundamental principle of the theory, namely, that a hospital owes an independent duty of care to its patients directly. In *Pederson v. Dumouchel*, 72 Wn.2d 73, 431 P.2d

973, 31 A.L.R.3d 1100 (1967), it was held that a hospital violated the duty of care it owed its patients when it permitted an operation without the presence of a medical doctor in the operating room. In *Osborn v. Public Hosp. Dist. 1*, 80 Wn.2d 201, 205, 492 P.2d 1025 (1972), the court stated that defendant hospital had a statutory duty with respect to patient care independent of the duty of care chargeable to the patient's attending physician.

We hereby expressly adopt the theory of corporate negligence. This is consistent with the *Pederson* and *Osborn* decisions, both of which have, arguably, adopted the theory by implication. Nearly every jurisdiction that has addressed the issue in the last 15 years has adopted corporate negligence. In addition, the doctrine is justified by the policy reasons already discussed.

## III

Having adopted the doctrine of corporate negligence, we turn now to the task of defining the standard of care to which hospitals will be held. An appropriate standard of care in cases involving hospital corporate negligence was enunciated by the *Pederson* court. In abandoning the old rule that measured a medical practitioner's performance by local standards, the court said that the required degree of care was "that of an average, competent practitioner acting in the same or similar circumstances." 72 Wn.2d at 79. The court went on to say "[m]uch that we have said also applies to . . . hospitals. They, too, are members of national organizations and subject to accreditation." 72 Wn.2d at 80.

The reference in *Pederson* to the accreditation of hospitals is significant in that it suggests a method of defining the standards of care a hospital should be held to, namely, the accreditation standards of the Joint Commission on Accreditation of Hospitals (JCAH). As one commentator has indicated:

> Perhaps the most important of the national standards voluntarily adopted by hospitals are those promulgated by the [JCAH]. The JCAH standards clearly establish

the institution's governing board as ultimately responsible for the overall quality of patient care provided in the hospital. The medical staff, in turn, is responsible to the governing board for the professional competence of all physicians and dentists who are members of the hospital's medical staff. The standards place particular emphasis on the appointment/reappointment process, delineation of clinical privileges, and periodic appraisals of each physician staff member. In addition, the hospital is required to institute reliable and valid measures that continuously evaluate the quality of care rendered all patients. JCAH accreditation means that a hospital has sufficiently complied with standards aimed at providing a comprehensive, ongoing system of review capable of identifying any incompetent members of the medical staff. The standards could be valuable as a measure against which the hospital's conduct is judged to determine if the institution is meeting its duty of care to patients.

(Footnotes omitted.) Koehn, 32 Rutgers L. Rev. at 369–70.

Also relevant to a hospital's standard of care are the hospital's own bylaws. *See, e.g., Purcell v. Zimbelman,* 18 Ariz. App. 75, 81, 500 P.2d 335 (1972). Hospitals are required by statute and regulation to. adopt bylaws with respect to medical staff activities. RCW 70.41.010, .030; WAC 248–18–030. It is "recommended" that the organization and functions of the medical staff under the bylaws be in accord with the JCAH standards. WAC 248–18–030(2). Bylaws are therefore based on national standards, and their use in defining a standard of care for hospitals is appropriate. This court has in fact indicated that it would use hospital bylaws in such a manner in *Pederson v. Dumouchel, supra.* In *Pederson,* the court's holding that the defendant hospital was negligent was "fortified" by the fact that the hospital, in allowing an independent dentist on its medical staff to operate on a patient under general anesthesia without a medical doctor present, had violated one of its own rules. 72 Wn.2d at 80.

IV

Our decision to adopt the doctrine of corporate neg-

ligence as enunciated by other jurisdictions does not necessarily entitle plaintiff in the case at bar to a reversal of the summary judgment against him. The alleged acts of malpractice committed by Dr. Bryant occurred entirely outside the hospital. Mrs. Pedroza was not a patient of the hospital at the time. For plaintiff to prevail, we must decide that the duty of care owed by hospitals under the corporate negligence doctrine extends not only to hospital patients, but also to patients treated by hospital staff members in those staff members' private office practices, where the hospital is not involved. No other jurisdiction appears to have done this; all the cases involve acts of malpractice committed at the hospital.

Defendant argues that extending a hospital's duty of care to patients outside the hospital would require a hospital to supervise and, if necessary, limit the private medical practices of its staff members outside the hospital. Such intervention could adversely affect the delicate physician–patient relationship. Substantial administrative problems would probably result as well.

This argument appears to be based upon a misconception of the doctrine of corporate negligence. The doctrine does not impose vicarious liability on a hospital for the acts of a medical staff member. The pertinent inquiry is whether the hospital exercised reasonable care in the granting, renewal, and delineation of staff privileges. This inquiry focuses on the procedures for the granting and renewal of staff privileges set forth in the hospital bylaws. In no case adopting corporate negligence premised upon a hospital's independent duty to select and maintain a competent medical staff has there been a suggestion that a hospital, in order to fulfill its duty of reasonable care, must supervise a physician's office practice. Acts of malpractice committed by a staff physician outside the hospital are relevant only if the hospital has actual or constructive notice of them, and where failure to take some action as a result of such notice is negligence. *Fridena v. Evans*, 127 Ariz. 516, 622 P.2d 463 (1980).

Plaintiff argues that defendant hospital's independent duty of care should extend to Maria Pedroza because she was a foreseeable plaintiff. Foreseeability determines the extent and scope of duty. *See Rikstad v. Holmberg,* 76 Wn.2d 265, 456 P.2d 355 (1969). Plaintiff alleges that Maria Pedroza used Dr. Bryant's services only because Dr. Bryant possessed admitting and obstetrical privileges at defendant hospital (each of Maria Pedroza's seven children had been born at Skagit Valley Hospital), and that it was, therefore, foreseeable that the hospital's alleged negligence in the granting or renewal of Dr. Bryant's staff privileges might result in harm to his obstetrical patients. Plaintiff argues that it should make no difference whether the harm occurred in or out of the hospital, as long as the harm was foreseeable. The doctrine of corporate negligence focuses on the negligence of the hospital in failing to rescind Dr. Bryant's privileges.

The fact remains, however, that every jurisdiction that has adopted corporate negligence has based the hospital's liability on the duty owed by the hospital *to its patients.* "The hospital's liability is based on a duty of care owed by the institution directly to patients to ensure their safety and welfare while within its confines." Koehn, 32 Rutgers L. Rev. at 360. The hospital holds itself out to the community as a competent provider of medical care. The hospital does *not* hold itself out as an inspector or insurer of the private office practices of its staff members. The delineation of staff privileges by the hospital can only affect the procedures used by staff members while they are inside hospital walls. The public cannot reasonably expect anything more.

This court has in the past recognized a hospital's independent duty of care only in those situations where the plaintiff was a patient of the hospital. *See Osborn v. Public Hosp. Dist. 1,* 80 Wn.2d 201, 492 P.2d 1025 (1972); *Pederson v. Dumouchel,* 72 Wn.2d 73, 431 P.2d 973, 31 A.L.R.3d 1100 (1967). RCW 70.41, which controls the licensing and regulation of hospitals, supports the limitation of a hospital's duty of care to those who are patients in the hospital.

RCW 70.41.010 provides in pertinent part: "The primary purpose of this chapter is to promote safe and adequate care of individuals in hospitals . . ."

Extending the hospital's duty of care to those who are not its patients would be undesirable in that it would likely grant those people a windfall, as any increased hospital costs resulting from such an extension of liability would be spread among hospital patients, rather than those who would benefit from the extended liability.

Accordingly, we hold that a hospital's duty of care under the doctrine of corporate negligence extends only to those who are patients within the hospital. Defendant Skagit Valley Hospital owed no duty to Maria Pedroza under the doctrine because she was not a hospital patient when the harm occurred. The fact that she had been a patient at defendant hospital in years past does not make her a patient for purposes of this case. Each of those prior hospital–patient relationships ended upon her discharge from the hospital; they did not continue indefinitely.

Since there are no allegations of negligence after Mrs. Pedroza was admitted to the hospital, we affirm the trial court's order of summary judgment.

WILLIAMS, C.J., ROSELLINI, UTTER, BRACHTENBACH, DOLLIVER, and DIMMICK, JJ., and CUNNINGHAM, J. Pro Tem., concur.