IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| TERRY FOSTER, | No. 82349-3-I |
| Appellant/Cross Respondent, | DIVISION ONE |
| v. | |
| BELLINGHAM UROLOGY SPECIALISTS, PLLC, a WA Professional Limited Liability Company, and SOREN CARLSEN, | |
| Respondents/Cross Appellants, | |
| UNITY CARE NORTHWEST, a WA Nonprofit Corporation, and DAN WHITE, LARRY THOMPSON, JENNIFER BRANCH, JON MARTIN, SUE RITTMUELLER, MICHAEL BATES, and REBECCA HALE, PAC; INTERFAITH COMMUNITY HEALTH CENTER, a WA Nonprofit Corporation, and JON MARTIN, DANIEL WHITTLE, SUSAN RITTMUELLER, and ELYA MOORE; MT. BAKER IMAGING, LLC, a WA Limited Liability Company, and its Members, NORTHWEST RADIOLOGISTS, INC., HEALTH VENTURES, and MATTHEW STUDLEY, MD; S. CASEY O' KEEFE, JOHN M. PETTIT, LONNI DODD, and DENISE M. TAYLOR, PAC; BELLINGHAM UROLOGY GROUP PLLC, a WA Professional Limited Liability Company, and JOHN PETTIT; JOHN and JANE DOES I-100; and all the above named parties' Husbands | UNPUBLISHED OPINION |

This opinion bases the citations and pin cites on the Westlaw online version of the cited material.

and Wives and their marital
communities,

     Defendants.

BOWMAN, J. — In this interlocutory appeal, Terry Foster assigns error to the trial court's orders dismissing his corporate negligence claim against Bellingham Urology Specialists PLLC (BUS) and his negligent supervision claim against BUS provider, Dr. Soren Carlsen. Because BUS is not a hospital and the doctrine of corporate negligence applies to only hospitals, we affirm the trial court's order dismissing that claim. And because Foster identifies no legal duty for Dr. Carlsen to supervise, we also affirm the trial court's order dismissing the negligent supervision claim. We remand for further proceedings.

FACTS

In 2005, doctors John Pettit and S. Casey O'Keefe formed BUS, providing professional urological and related health care services. In 2008, BUS hired certified physician assistant (PA-C) Denise Taylor. Taylor worked under a practice plan approved by the Department of Health (DOH) that designated Dr. Pettit as her supervising physician and Dr. O'Keefe as an alternate supervising physician. Dr. Pettit and Dr. O'Keefe trained Taylor in "all areas of their practice."

In 2009, BUS hired Dr. Carlsen, who became a member of the PLLC in 2011. In 2012, BUS also hired Dr. Kelly Casperson. All the BUS doctors made themselves available to consult with Taylor if she had questions. And the doctors often discussed Taylor's cases with her and "frequently" provided her with "hands-on, on-the-job training."

On September 27, 2013, Foster visited his primary care provider after discovering a lump in his penis. An ultrasound showed that Foster's lump was likely Peyronie's disease.[1] Foster's primary care provider referred him to BUS.

On January 14, 2014, Taylor evaluated Foster, which included a physical examination, reviewing his medical history and the ultrasound images, and questioning him on his urologic and sexual health. After Foster reported no concerns and Taylor found none, she concurred with the Peyronie's disease diagnosis and reassured Foster that his lump was benign. Taylor did not consult the other BUS doctors about Foster's case.

Taylor left BUS in April 2014. Four months later on August 5, Foster returned to BUS for a follow-up visit and saw Dr. Carlsen. Foster told Dr. Carlsen that the lump had become slightly larger and sometimes restricted his ability to urinate. Dr. Carlsen ordered a cystoscopy, which showed there was a "dense nodular stricture" narrowing Foster's urethra. Dr. Carlsen recommended a biopsy of the lump, telling Foster to follow up in one to three weeks to discuss his options, including surgery.

Foster returned to BUS on September 18, 2014 and told Dr. Carlsen that he was "unsure if the lump on his penis is still present." Foster said he had been treating the lump with cannabis oil and was experiencing no pain. But he explained that urination issues persisted, along with a "downward curvature [of his] erection." Dr. Carlsen "again explained [his] concern for the possibility of

---

[1] Foster's urologic expert Dr. J. Bruce Robertson described Peyronie's disease as the "development of scar tissue involving the erectile tissue of the penis, which is termed the co[r]pora cavernosa."

malignancy" and "strongly encouraged" a biopsy. At Foster's request, Dr. O'Keefe offered a second opinion. Dr. O'Keefe "concurred" with Dr. Carlsen's findings and recommendations but suggested that Foster also obtain an MRI.[2] Dr. Carlsen then referred Foster to University of Washington Medicine at Harborview Medical Center (UW Harborview) for "a [second] opinion outside [the BUS] clinic."

Dr. Bryan Voelzke evaluated Foster at UW Harborview on October 9, 2014. Dr. Voelzke explained there was a "small chance" the lump was cancerous and scheduled Foster for an MRI. The MRI of Foster's pelvis showed "no evidence" of abnormally enlarged lymph nodes "or concern for urethral carcinoma." But "given the aggressive nature of the scar tissue on his penis," Dr. Voelzke scheduled Foster for a perineal urethrostomy.[3] Dr. Voelzke would also perform a urethral biopsy during the surgery.

UW Harborview surgeons performed the perineal urethrostomy and transurethral biopsy on November 14, 2014. The biopsy showed "invasive carcinoma." A radiologist reinterpreted Foster's MRI and determined that the cancerous lump within Foster's urethra had "invaded" the surrounding tissue. As a result, Foster returned to UW Harborview on November 21, 2014 for a total penectomy—the surgical removal of his penis.

---

[2] Magnetic resonance imaging.

[3] Foster's expert urologist Dr. Dudley Danoff explained that a perineal urethrostomy relieves narrowing of the urethra by "re-routing . . . urine from [the] penis to a new exit under [the] scrotum."

Procedural History

In November 2014, Dr. Pettit left BUS and formed Bellingham Urology Group PLLC (BUG). Then, in February 2015, Dr. Carlsen, Dr. O'Keefe, and Dr. Casperson founded Pacific Northwest Urology Specialists LLC (PNWUS). The doctors had fully dissolved BUS by April 2015. PNWUS maintained BUS' patient files after the dissolution.

On January 14, 2017, Foster served only BUS with a request for mediation.[4] The request stated, in relevant part:

> I believe the care and treatment I received at your clinic was negligence, and that had I had proper treatment I would have had a better outcome.
> Pursuant to RCW 7.70.110 [tolling the statute of limitations for one year], I request mediation.

Almost a year later, on January 10, 2018, Foster sued more than 20 health care providers, including BUG, BUS, and former BUS employees Dr. Pettit, Dr. O'Keefe, Dr. Carlsen, PA-C Taylor, and administrator Lonni Dodd. Foster alleged medical malpractice under chapter 7.70 RCW, unprofessional conduct under "multiple violations" of RCW 18.130.180, and negligent treatment under RCW 18.130.180(4).

A. Stipulated Dismissals

In May 2018, the BUG and BUS defendants moved for summary judgment dismissal of Foster's claims as time barred. BUS acknowledged that Foster's mediation request tolled the statute of limitations as to his claims against the

---

[4] Foster mailed the request to a Seattle law firm.

PLLC, but it argued that the claims against the individual defendants were time barred because he did not serve them with the mediation request. BUS also argued the court should dismiss Dodd because she was an administrator, not a health care provider. BUG argued the court should dismiss the claims against it because it did not exist until November 25, 2014 and never treated Foster.

At a hearing on June 1, 2018, the parties agreed to dismiss BUG, Dr. Pettit, Dr. O'Keefe, and Dodd with prejudice, leaving only BUS, Dr. Carlsen, and Taylor as named defendants.[5] In exchange, BUS acknowledged vicarious liability for any negligence by Dr. Carlsen or Taylor. And they agreed that Foster's claim against BUS was not time barred. The trial court requested the parties provide supplemental briefing on whether Foster's mediation request tolled the statute of limitations as to Dr. Carlsen and Taylor.

Soon after, Dr. Carlsen and Taylor renewed their motion to dismiss, arguing again that Foster did not serve them with a mediation request under RCW 7.70.110, so his claims against them were time barred. On September 7, 2018, the trial court dismissed Foster's claims against Taylor with prejudice but deferred its ruling as to Dr. Carlsen.[6] The parties proceeded to discovery.

---

[5] The parties also agreed to dismiss with prejudice Dr. Matthew Studley; Mt. Baker Imaging LLC; Northwest Radiologists Inc.; Unity Care NW; Unity Care employees Dan White, Larry Thompson, Jennifer Branch, Jon Martin, Sue Rittmueller, Michael Bates, and Rebecca Hale; Unity Care subsidiary Interfaith Community Health Center; Interfaith employees Daniel Whittle and Elya Moore; and Health Ventures. These dismissed defendants are not parties to this appeal.

[6] It does not appear from the record that the court has issued a ruling on whether Foster's claims against Dr. Carlsen are time barred.

B. Motions to Vacate and Amend Complaint

Almost two years later in August and September 2020, Foster moved (1) for permission to amend his complaint to add PNWUS as a defendant, (2) to vacate the stipulated orders dismissing Dr. Pettit, Dr. O'Keefe, Dodd, and BUG, and (3) to vacate the court's order dismissing Taylor.[7]  Foster argued that PNWUS and BUG were a "mere continuation" of BUS and that BUS fraudulently transferred assets to the corporations to avoid liability.  He also claimed that he only recently learned through discovery that Dr. Pettit and Dr. O'Keefe had a duty to supervise Taylor under either RCW 18.100.070[8] or former RCW 18.71A.050 (1994).[9]  And Foster renewed his argument that his mediation request tolled the statute of limitations on his claim against Taylor.

Following a hearing on September 1, 2020, the trial court denied Foster's motions.  In a memorandum decision issued September 9, 2020, the court noted that Foster's theories about PNWUS and BUG were "speculative and [not] supported by the evidence."  And it determined there was no evidence that the doctors formed either company with fraudulent intent.  As to Dr. Pettit and Dr.

---

[7] Foster also moved to compel discovery.

[8] The relevant part of RCW 18.100.070 provides:
Any director, officer, shareholder, agent, or employee of a corporation organized under this chapter shall remain personally and fully liable and accountable for any negligent or wrongful acts or misconduct committed by him or her or by any person under his or her direct supervision and control, while rendering professional services on behalf of the corporation to the person for whom such professional services were being rendered.

[9] Under former RCW 18.71A.050, "[t]he supervising physician and physician assistant shall retain professional and personal responsibility for any act which constitutes the practice of medicine as defined in RCW 18.71.011 when performed by the physician assistant."

O'Keefe, the court noted that vacating their stipulated dismissals would "prejudice both these former defendants . . . [and] vitiate the vicarious liability provision which was a material term of the stipulation." Finally, as to the claim against Taylor, the court noted that Foster's motion provided "the same information and argument" as his earlier motion "and is essentially a second Motion for reconsideration."

### C. Summary Judgment

Around the same time, in August 2020, the parties cross moved for summary judgment on Foster's medical negligence claim against Dr. Carlsen. BUS and Dr. Carlsen argued that Foster lacked qualified medical expert testimony establishing the standard of care, breach, and causation for his claim. Foster asserted that Dr. Carlsen was liable for Taylor's actions as her supervisor.

The trial court heard argument on both summary judgment motions on September 11, 2020. In its oral ruling, the court denied Foster's motion. It then granted defendants' motion to dismiss Foster's "duty to supervise" claim because no evidence showed BUS or Dr. Carlsen had a duty to supervise Taylor. But the court refused to dismiss Foster's medical negligence claim against Dr. Carlsen, finding disputed issues of material fact remained "as to whether the delay in treatment between August 5[, 2014] and . . . when the penectomy was done . . . [was] below the standard of care."[10]

---

[10] The medical negligence claim against Dr. Carlsen is still pending in the trial court and is not the subject of this appeal.

8

Foster moved for reconsideration, arguing that registration of Dr. Pettit and Dr. O'Keefe as Taylor's supervisors on her DOH practice plan was only "pro forma," and, in practice, Dr. Carlsen also supervised Taylor. In response, BUS and Dr. Carlsen argued there was no evidence that Dr. Carlsen "had direct or indirect supervisory control" over Taylor. And, as to BUS, they argued that even if Foster's references to a "supervision" claim implied a corporate negligence action, he did not properly plead such a claim.[11] On October 12, 2020, the trial court granted Foster's motion for reconsideration, finding that there were "disputed issues of fact" as to Foster's claims that BUS and Dr. Carlsen breached a duty to supervise Taylor.

The next week, BUS and Dr. Carlsen moved for reconsideration and clarification of the October 12, 2020 order, arguing that a negligent supervision claim against them both is "redundant" because BUS already conceded vicarious liability for Dr. Carlsen's actions. At a hearing on November 23, 2020, the trial court granted BUS' motion in part, dismissing the negligent supervision claim against Dr. Carlsen. Foster then filed another motion for reconsideration.

On December 17, 2020, the trial court issued an "Order Granting in Part and Denying in Part Defendants' Motion for Clarification and Reconsideration of Order on Plaintiff's Motion for Reconsideration Re: Supervision," ruling:

1. The doctrine of corporate negligence does not apply, under the facts of this case;

---

[11] BUS and Dr. Carlsen noted, "Up until this most recent motion, Plaintiff made no indication to Defendants that he may be hinting at a claim for corporate negligence, and even here Plaintiff makes no specific reference to the doctrine."

2. Bellingham Urology Specialists (BUS), as the entity employing Denise Taylor, PA-C, had a duty to supervise Ms. Taylor's work. Plaintiff may proceed against BUS on his claim that BUS breached that duty and proximately caused damage to Mr. Foster.

3. Plaintiff's claim against Dr. Carlsen as an individual, alleging breach of a duty to supervise Ms. Taylor, is dismissed. The plaintiff's motion for a further reconsideration of this issue is denied.

4. The Plaintiff's failure to supervise claim, against BUS, is separate and apart from the claim relating to the negligence of Denise Taylor, PA-C such that the supervisory claim does not depend on a finding that Ms. Taylor was negligent in her care of Mr. Foster.

Foster then filed a "Motion for Court Findings, Express Direction, and Express Determination for Appeal to Court of Appeals" under RAP 2.2(d). Foster asked for review of the trial court's December 17, 2020 order dismissing his "claim against Defendant Dr. Carlsen for failure to properly supervise PA-C Denise Taylor." Foster argued the possibility that a direct appeal may result in a second trial warranted interlocutory review. BUS and Dr. Carlsen objected, arguing that CR 54(b) certification for interlocutory review was not appropriate. But they asked that "if the Court for whatever reason is inclined to grant Plaintiff's motion," it should "finalize the entire December 17th order for appeal." Foster agreed, stating, "I guess I wouldn't mind all four of those [rulings] going forward."

Following a hearing on January 6, 2021, the trial court granted Foster's motion, ruling:

> The issues addressed in the Court's order of December 17th are closely related to the issue of Dr. Carlsen's individual liability, if any, and I think that it is fair for both parties for all of those issues to be certified rather than for the Court to simply select the issue of Dr. Carlsen's personal alleged failure to supervise.

On January 8, 2021, the court entered an order "pursuant to CR 54(b) and RAP

10

2.2(d)," directing the entry of final judgment and certifying for appeal its December 17, 2020 order on reconsideration and clarification. And the court made written findings supporting its certification under CR 54(b).

Foster then filed a notice of appeal, designating the court's December 17, 2020 order on reconsideration and its January 8, 2021 order on certification. He also sought discretionary review of the trial court's following rulings:

> 6/1/18 Stipulation and Order Dismissing Defendants S. Casey O'Keefe, MD, John M. Pettit, MD, Lonni Dodd, Bellingham Urology Group, PLLC, with Prejudice and Without Costs and Fees

> 9/9/20 Order Denying Motion to Vacate to 6/1/18 Stipulation and Order Dismissing Defendants S. [C]asey O'Keefe, MD, John M. Pettit, MD, Lonni Dodd, Bellingham Urology Group, PLLC

> 9/9/20 Decision Regarding Motions to Amend Complaint, Compel Discovery, and Vacate Prior Orders

> 12/17/20 Order on Motion for Reconsideration (Regarding vacating dismissal of Dr. Pettit and [Dr.] O'Keefe).

BUS cross appeals, seeking review of only rulings 2 and 4 of the trial court's December 17, 2020 order.

ANALYSIS

Appealability

Both parties seek interlocutory review of several trial court rulings. They contend that the trial court's December 17, 2020 order on reconsideration amounts to a final judgment reviewable under RAP 2.2(d). And Foster asks for discretionary review of several additional rulings under RAP 2.3.

A.  Final Judgments under RAP 2.2(d)

A court generally must resolve all claims for and against all parties before it enters a final judgment on any part of a case.  Loeffelholz v. Citizens for Leaders with Ethics & Accountability Now, 119 Wn. App. 665, 693, 82 P.3d 1199 (2004).  But RAP 2.2(d) and its companion rule, CR 54(b), create an exception to allow interlocutory appeal in multiclaim and multiparty actions.

Under RAP 2.2(d), in a case with multiple parties or multiple claims for relief,

> an appeal may be taken from a final judgment that does not dispose of all the claims or counts as to all the parties, but only after an express direction by the trial court for entry of judgment and an express determination in the judgment, supported by written findings, that there is no just reason for delay.

Still, a party may appeal under RAP 2.2(d) only if the trial court issues a final order under CR 54(b) that expressly "direct[s] the entry of a final judgment as to one or more but fewer than all of the claims or parties" and contains an express determination supported by written findings that there is no just reason for delay.  See Fluor Enters., Inc. v. Walter Constr., Ltd., 141 Wn. App. 761, 766-67, 172 P.3d 368 (2007).

While "[s]ome deference is given to the trial judge's opinion that the rule 54(b) requirements have been met, . . . a trial court's certification that a decision meets the requirements of CR 54(b) is not conclusive."  Nelbro Packing Co. v. Baypack Fisheries, LLC, 101 Wn. App. 517, 523, 6 P.3d 22 (2000).  Before accepting review under RAP 2.2(d), we must be satisfied that the trial court

properly reached a final judgment as to any of the claims or parties. Id.[12] A final judgment is "the final determination of the rights of the parties in the action and includes any decree and order from which an appeal lies." CR 54(a)(1); Anderson & Middleton Lumber Co. v. Quinault Indian Nation, 79 Wn. App. 221, 225, 901 P.2d 1060 (1995) ("A final judgment is a judgment that ends the litigation, leaving nothing for the court to do but execute the judgment."), aff'd, 130 Wn.2d 862, 929 P.2d 379 (1996).

Here, rulings 1 and 3 of the trial court's December 17, 2020 order stating that (1) "[t]he doctrine of corporate negligence does not apply, under the facts of this case," and (3) "Plaintiff's claim against Dr. Carlsen as an individual, alleging breach of a duty to supervise Ms. Taylor, is dismissed," amount to final judgments reviewable under RAP 2.2(b). These rulings are final determinations ending litigation over two of Foster's claims.

But rulings 2 and 4 of the trial court's order providing that (2) BUS "had a duty to supervise Ms. Taylor's work, [and] Plaintiff may proceed against BUS on his claim that BUS breached that duty and proximately caused damage to Mr. Foster," and (4) "Plaintiff's failure to supervise claim, against BUS, is separate and apart from the claim relating to the negligence of Denise Taylor," do not amount to final judgments reviewable under RAP 2.2(b). Orders leaving issues for trial are subject to only discretionary review. See Glass v. Stahl Specialty

---

[12] We also consider whether the trial court abused its discretion by determining that there was no just reason for delay. Nelbro Packing, 101 Wn. App. at 524-25. A court abuses its discretion if the decision was manifestly unreasonable or exercised on untenable grounds or for untenable reasons. Id. at 525. We give substantial deference to the trial court's judgment, and here, we cannot say the trial court's determination about unjust delay was manifestly unreasonable. Id.

Co., 97 Wn.2d 880, 883, 652 P.2d 948 (1982). As a result, we decline to address rulings 2 and 4.

B. Discretionary Review

Foster also seeks discretionary review, asking us to reverse the trial court's (1) stipulation and order dismissing Dr. Pettit, Dr. O'Keefe, Dodd, and BUG, (2) order denying his motion to vacate the stipulated order dismissing those defendants, (3) order denying his motion to vacate its order dismissing Taylor, and (4) order denying his motion to amend his complaint to add PNWUS as a party.

Under RAP 5.1(a), "[a] party seeking review of a trial court decision subject to discretionary review must file a notice of discretionary review . . . within the time provided by rule 5.2." RAP 5.2(b) says that a notice of discretionary review "must be filed in the trial court within . . . 30 days after the act of the trial court that the party filing the notice wants reviewed." And a party seeking discretionary review must "file in the appellate court a motion for discretionary review within 15 days after filing the notice for discretionary review." RAP 6.2(b).

Here, the trial court entered the stipulated dismissal on June 1, 2018 and its orders denying Foster's motions to vacate on September 9, 2020. Foster filed his notice of discretionary review in superior court on February 5, 2021, well beyond the 30 days allowed under RAP 5.2(b). And Foster filed no motion for

discretionary review in this court.[13]  We decline to review Foster's additional assignments of error.

<u>Review of Final Judgments</u>

We review summary judgment decisions[14] de novo.  <u>Bavand v. OneWest Bank, FSB</u>, 196 Wn. App. 813, 825, 385 P.3d 233 (2016).  Summary judgment is appropriate if there are no genuine issues of material fact, entitling the moving party to judgment as a matter of law.  CR 56(c); <u>Cotton v. Kronenberg</u>, 111 Wn. App. 258, 264, 44 P.3d 878 (2002).  A moving party is entitled to judgment as a matter of law when the nonmoving party " 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.' "  <u>Miller v. Likins</u>, 109 Wn. App. 140, 145, 34 P.3d 835 (2001)[15] (quoting <u>Young v. Key Pharms., Inc.</u>, 112 Wn.2d 216, 225, 770 P.2d 182 (1989)).  When reviewing a summary judgment order, we engage in the same inquiry as the trial court and construe the facts in a light most favorable to the nonmoving party.  <u>Babcock v. Mason County Fire Dist. No. 6</u>, 144 Wn.2d 774, 784, 30 P.3d 1261 (2001).

---

[13] Foster moved for discretionary review of the four orders on March 10, 2023, two months after oral argument.  And he added the trial court's September 7, 2018 order dismissing Taylor to the decisions on review.  We reject the motion as untimely.  RAP 5.2(b), 6.2(b).

[14] The trial court's December 17, 2020 order ultimately clarifies its September 11, 2020 oral ruling denying Foster's motion for partial summary judgment on the individual liability of Dr. Carlsen and granting in part BUS and Dr. Carlsen's motion for partial summary judgment to dismiss Foster's negligent supervision claims.

[15] Internal quotation marks omitted.

To establish negligence, a plaintiff must show (1) the existence of a duty, (2) breach of that duty, (3) resulting injury, and (4) proximate cause. Ranger Ins. Co. v. Pierce County, 164 Wn.2d 545, 552, 192 P.3d 886 (2008). In every negligence action, "the threshold question is whether the defendant owes a duty of care to the injured plaintiff." Schooley v. Pinch's Deli Mkt., Inc., 134 Wn.2d 468, 474, 951 P.2d 749 (1998). The existence of a legal duty is a question of law, while the scope of that duty is a question of fact. McKown v. Simon Prop. Grp., Inc., 182 Wn.2d 752, 762, 344 P.3d 661 (2015).

A. Corporate Negligence Claim

Foster argues the corporate negligence doctrine applies to BUS and imposes a duty on the PLLC to train its physician assistants and their supervisors "to prevent negligence," to oversee a physician assistant's practice of medicine, and to "adopt and enforce rules and policies for proper doctor supervision of PA[-C]s to prevent negligence." We disagree.

The corporate negligence doctrine imposes on a hospital "a nondelegable duty owed directly to [its] patient, regardless of the details of the doctor-hospital relationship." Pedroza v. Bryant, 101 Wn.2d 226, 229, 677 P.2d 166 (1984). Among other things, the doctrine imposes a duty on a hospital to maintain its premises, select its employees with reasonable care, and supervise its medical providers. Douglas v. Freeman, 117 Wn.2d 242, 248, 814 P.2d 1160 (1991). Courts hold a hospital to the standard of care of an average, competent health care facility acting in the same circumstances. Ripley v. Lanzer, 152 Wn. App. 296, 324, 215 P.3d 1020 (2009). The Joint Commission on the accreditation of

16

hospitals generally defines the standard of care based on its own standards and the hospital's own bylaws.  Id.; see also RCW 70.41.010 (requiring hospitals to set minimum standards for the maintenance and operation of their facilities).

Foster acknowledges that BUS is not a hospital.  Still, citing Douglas, Foster argues that Washington courts have expanded the doctrine of corporate negligence to apply to professional health entities other than hospitals.  In Douglas, the plaintiff sued both a dental resident of Providence Dental Clinic and the clinic's parent entity, "Sisters of Providence in Washington, d/b/a Providence Medical Center."  117 Wn.2d at 242, 245.  Our Supreme Court found that sufficient evidence supported a corporate negligence verdict against the clinic—an entity of Providence Medical Center, a hospital.  Id. at 252.  The court did not address whether the corporate negligence doctrine applies to an entity that is not a hospital.  Indeed, Foster cites no Washington case that applies the doctrine of corporate negligence to an entity other than a hospital.  We presume that he could not find such authority.  See Helmbreck v. McPhee, 15 Wn. App. 2d 41, 57, 476 P.3d 589 (2020).

The trial court did not err in dismissing Foster's corporate negligence claim at summary judgment.

### B.  Duty to Supervise Claim

Foster argues that the trial court erred by concluding Dr. Carlsen had no duty to supervise PA-C Taylor under the physician assistants act, chapter 18.71A

RCW.[16]  We disagree.

Chapter 18.71A RCW governs the licensing of physician assistants.  A physician assistant must apply to the medical quality assurance commission[17] for permission to be "employed or supervised by a physician or physician group." Former RCW 18.71A.040(2) (2013), repealed by LAWS OF 2020, ch. 80, § 60; former RCW 18.71A.010(2) (1994).  The commission will license a physician assistant to practice medicine only under the supervision of a physician.  Former RCW 18.71A.010(1).  A physician assistant and her supervising physician must jointly submit a "delegation agreement," or practice plan, that "delineate[s] the manner and extent to which the physician assistant would practice and be supervised."  Former RCW 18.71A.040(2).  A physician assistant can practice only if the commission approves the delegation agreement "and only to the extent permitted by the commission."  Former RCW 18.71A.030 (2013).  And "[t]he supervising physician and physician assistant shall retain professional and personal responsibility for any act which constitutes the practice of medicine as defined in RCW 18.71.011 when performed by the physician assistant."  Former RCW 18.71A.050.

---

[16] Foster did not plead negligent supervision but raised the theory during litigation.  Throughout the record, the parties refer to Foster's claim as "negligent supervision."  A common law cause of action for negligent supervision recognizes that "an employer may be held liable for acts beyond the scope of employment if it had prior knowledge of the dangerous tendencies of its employee."  Thompson v. Everett Clinic, 71 Wn. App. 548, 555, 860 P.2d 1054 (1993).  Foster does not allege that Taylor acted beyond the scope of employment, so we do not address common law negligent supervision.  Foster argued below that both chapter 18.71A RCW and RCW 18.100.070 of the Professional Service Corporation Act gave rise to a duty to supervise.  But at oral argument, Foster clarified that his claim relies on only the duty to supervise under chapter 18.71A RCW.

[17] Now known as the Washington Medical Commission.

Taylor executed a practice plan for employment at BUS on December 15, 2008. DOH approved the plan on December 17, 2008. Taylor's practice plan identifies "John Pettit, M.D." as her supervising physician and "S. Casey O'Keefe, M.D." as her alternate supervising physician. Still, Foster argues that Dr. Carlsen "is liable as undisputed supervisor of Taylor whether he is on the DOH form or not." According to Foster, the evidence shows that Dr. Carlsen supervised Taylor in practice, and former WAC 246-918-055(2)(a) (2015) "allows BUS to appoint alternate supervising doctors without having to identify them on the DOH form."

Former WAC 246-918-055(2)(a) requires that a practice plan identify "[t]he names and Washington state license numbers of the sponsoring physician and alternate physician, if any. In the case of a group practice, the alternate physicians do not need to be individually identified." But DOH did not codify former WAC 246-918-055(2)(a) until 2015, long after Foster first saw Taylor in January 2014. Wash. St. Reg. (WSR) 15-04-122 (effective March 6, 2015). The WAC in effect then, former WAC 246-918-080 (2001), said nothing about designating a supervising physician within a group practice. But it required that if a physician assistant "desires to become associated with another physician, he or she must submit a new practice plan." Former WAC 246-918-080(3). No evidence shows that Taylor submitted a new practice plan designating Dr. Carlsen as her supervisor.

And even if chapter 18.71A RCW and the WACs allowed for Dr. Carlsen to assume supervision of Taylor, the facts do not support that he did. Foster

19

argues that Dr. Carlsen supervised Taylor by making himself available to consult with her and periodically training her. But Foster offers no authority that consulting and training amount to supervising. And nothing in the record suggests that Dr. Carlsen assumed responsibility for Taylor's day-to-day activities.

We affirm the trial court's dismissal of Foster's corporate negligence claim against BUS and his duty to supervise claim against Dr. Carlsen and remand for further proceedings.

Brennan, J

WE CONCUR:

Díaz, J.                          Coburn, J.