# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| JENNIFER SEDGLEY, PERSONAL REPRESENTATIVE OF THE ESTATE OF CHAD RANDALL, | No. 60638-1-II |
| Appellant, | |
| v. | |
| PEACEHEALTH; SANJIN ISAKOVIC, DO; and ADAM S. WILSON, MD, | UNPUBLISHED OPINION |
| Respondents. | |

MAXA, J. – Jennifer Sedgley, as personal representative of the estate of Chad Randall, sued PeaceHealth, Dr. Adam Wilson, Dr. Sanjin Isakovic, and Jon Olson, R.N., for their alleged negligence stemming from Randall's death arising from an ear infection. Sedgley appeals the trial court's final judgment following a jury verdict in favor of the defendants.

Randall went to the emergency room at PeaceHealth St. John's Medical Center in Longview complaining of ear pain. He was diagnosed with an external and middle ear infection and discharged with antibiotics. Randall returned to the emergency room two days later with continued ear pain. He saw Dr. Isakovic, an emergency room physician, who consulted Dr.

Wilson, an otolaryngologist (ENT). They prescribed different antibiotics, collected samples for blood tests, and discharged Randall again.

Shortly before 4:00 AM the next morning, Randall's blood test results returned positive for streptococcus pneumoniae, indicating a bacterial infection. This was a critical result, which under PeaceHealth's policy required that the physician be notified as soon as possible. The laboratory contacted the PeaceHealth emergency department, but the medical records do not identify who received the information. An emergency department nurse, Olson, saw the result around 5:30 AM and attempted to contact Randall, but Randall did not answer the phone. There is no indication that Olson or anyone else immediately notified a physician.

A PeaceHealth inpatient pharmacist, Dr. Lauren Cooper, saw the blood culture results at 6:22 AM. She later exchanged TEAMS messages with another pharmacist regarding Randall's treatment.

Randall returned to the emergency room in the late morning with worsening symptoms. He was transferred to a different hospital for more intensive treatment, and he subsequently died from complications of bacterial meningitis.

Before trial, the trial court granted summary judgment in favor of PeaceHealth on Sedgley's corporate negligence claim and excluded the testimony of Sedgley's expert witness regarding the pharmacy standard of care, which essentially served to dismiss her pharmacy negligence claim. At trial, the court excluded certain trial testimony from two of Sedgley's expert witnesses as a discovery sanction, excluded portions of the TEAMS messages between the two pharmacists, and granted a CR 50 directed verdict in favor of PeaceHealth on Sedgley's claim that some unidentified nurses acted negligently regarding the critical blood test result. The jury returned a verdict finding that neither Dr. Wilson, Dr. Isakovic, nor Olson was negligent.

We hold that (1) even if the trial court erred in granting summary judgment in favor of PeaceHealth's regarding Sedgley's corporate negligence claim, that issue is moot because the jury found that Olson was not negligent; (2) the trial court did not err in excluding testimony of Sedgley's expert on the pharmacist standard of care because there was no evidence that any pharmacist negligence was a proximate cause of Randall's death; (3) the trial court did not err in excluding certain testimony from one of Sedgley's expert witnesses and a proposed rebuttal witness as a discovery sanction because the court adequately considered the *Burnet*[1] factors; (4) the trial court did not err in excluding portions of the TEAMS messages between two PeaceHealth pharmacists because they were misleading or unfairly prejudicial; and (5) the trial court did not err in granting PeaceHealth's CR 50 motion for judgment as a matter of law with respect to the negligence of unidentified PeaceHealth nurses because there was no evidence that some unidentified nurse was negligent. We further hold that Sedgley waived her appeal with respect to Dr. Isakovic because she failed to assign error to any trial court ruling that impacted her medical negligence claim against him.

Accordingly, we affirm the trial court's final judgment in favor of PeaceHealth, Dr. Wilson, Dr. Isakovic, and Olson.

FACTS

*Randall's Treatment*

On March 3, 2021, Randall went to the emergency room at PeaceHealth St. John Medical Center. He reported that he suffered from a migraine and ear pain in his right ear. After having imaging and bloodwork done, Randall was treated for an infection of the middle or outer ear.

---

[1] *Burnet v. Spokane Ambulance*, 131 Wn.2d 484, 933 P.2d 1036 (1997).

The emergency department physician prescribed Randall with an antibiotic called Augmentin and discharged him.

Randall returned to the PeaceHealth emergency room in the early morning of March 5 and was seen by Dr. Isakovic. Randall reported that he had continued pain in his right ear and that although the antibiotics initially provided some relief, he still had a headache. Dr. Isakovic ordered a CT scan and blood work, the results of which confirmed that Randall still had symptoms consistent with an infection of the outer or middle ear. Dr. Isakovic also ordered a blood culture test. Blood culture tests take a while to perform.

Dr. Isakovic consulted Dr. Wilson, an ENT. Dr. Wilson recommended switching Randall's antibiotic to ciprofloxacin and following up in a few days. Randall was prescribed oral and eardrop ciprofloxacin and discharged with instructions to see Dr. Wilson for follow-up treatment.

At approximately 4:00 AM on March 6, Randall's blood test returned as positive for the bacteria streptococcus pneumoniae. The test stated that the presence of streptococcus pneumoniae was "critical!!" Clerk's Papers (CP) at 338. Jason Scott, who worked at the laboratory that tested Randall's blood cultures, transmitted the information to the PeaceHealth emergency department. The medical records do not identify who in the emergency department received the information from the laboratory. One expert testified that Olson, an emergency department nurse, saw the critical blood culture test result and attempted to call Randall at 5:27 AM, but Randall did not answer the phone. There is no indication that Olson or anyone else notified a physician of the critical test result.

Dr. Lauren Cooper, a PeaceHealth inpatient pharmacist, saw Randall's blood culture results at 6:22 AM when she arrived at the hospital.

Randall returned to the hospital around 11:00 AM on March 6 because his headache had worsened. He was admitted to the emergency room for mastoiditis, bacteremia, leukocytosis, and hypokalemia. Randall was treated by Dr. Benjamin Rader, who consulted Dr. Wilson. Dr. Wilson stated that he was not a middle ear specialist and would need to consult another ENT. Dr. Rader prescribed Randall ceftriaxone and consulted a different ENT who had treated Randall for ear infections. Dr. Rader spoke with a physician at Providence Portland hospital, who agreed to accept Randall for transfer and admission for inpatient care.

After Randall was admitted to the emergency department again on March 6, Dr. Cooper messaged with another pharmacist, Dr. Okerson, through Microsoft TEAMS. Dr. Cooper discussed Randall's initial prescription of Augmentin versus ciprofloxacin, stating that "Cipro likely not the best." CP at 1555. Dr. Cooper then said that "Cipro was a weird recommendation" and Dr. Okerson responded "Yeah." CP at 1555. In addition, Dr. Cooper and Dr. Okerson messaged about Dr. Isakovic's discussion with Dr. Wilson, and Dr. Wilson's statement that he was not a specialist of the middle ear. Dr. Okerson sarcastically stated, "Yeah, I'm ENT, but not *that* ENT." CP at 1556 (emphasis in original).

On March 8, after learning that Randall was dying from his infection, Dr. Cooper stated, "Well now I feel terrible that I didn't call him first thing" and "why did ED not call him omg." CP at 1557. Dr. Okerson also stated, "Why ED didn't I don't know. It results at 11 PM." CP at 1557. The last message from Dr. Cooper was "Yeah ED should have definitely called him. Ugh!" CP at 1557.

After Randall was transferred to Providence Portland hospital, he died on March 9 of complications from bacterial meningitis.

PeaceHealth had a written critical test results reporting policy. The policy required that staff must "immediately notify the [physician] of the critical lab result as soon as possible, but no more than 1 hour from receiving the result." CP at 219. If the physician cannot be reached within 15 minutes, a second call must be made.

*Complaint*

In May 2022, Sedgley filed a medical negligence wrongful death lawsuit against PeaceHealth, Dr. Wilson, and Dr. Isakovic. Sedgley alleged that Dr. Isakovic and Dr. Wilson were negligent in treating Randall.[2] She also alleged that PeaceHealth was vicariously liable for negligence as Dr. Isakovic and Dr. Wilson's employer. Specifically, Sedgley alleged that the failure to treat Randall for a middle ear infection led to Randall's meningitis and death.

Sedgley did not separately allege a claim of corporate negligence against PeaceHealth in her complaint. However, subsequent discovery indicated that Sedgley would pursue a corporate negligence theory of liability.

*Corporate Negligence Summary Judgment*

In January 2024, PeaceHealth filed a motion for partial summary judgment on Sedgley's claim of corporate negligence. PeaceHealth made two main arguments in support of its motion. First, PeaceHealth argued that Washington law does not recognize a theory of corporate negligence for a hospital's failure to follow its own internal policies and procedures, which Sedgley alleged was PeaceHealth's negligent act. Second, PeaceHealth argued that even if it

---

[2] Olson and Dr. Cooper were not named in the complaint, but the parties continued to litigate as though they were a part of the case. Sedgley argued that she did not need to amend her complaint after discovery of Olson and Dr. Cooper's alleged negligence. But it appears that PeaceHealth did not argue that amendment was required.

owed Sedgley a duty to follow its own internal policies and procedures, Sedgley did not provide adequate expert testimony about how PeaceHealth breached an established standard of care.

In support of its motion, PeaceHealth cited the deposition of Dr. Kayur Patel, Sedgley's expert witness in emergency medicine and hospital administration. In his deposition, Dr. Patel testified,

> Q. Okay. So I'm a little confused on that last sentence. You say that PeaceHealth should have a system in place to ensure that patients are contacted regarding a lab result of this type and the outcome indicates the process was not followed. So are you -- is your opinion that there's an inadequate policy and procedure in place, or is it you opinion that there is an adequate procedure in place but it simply was not followed?
>
> A. It is -- after -- the policies appear to be adequate, but the policy was not adhered to or followed.
> . . . .
>
> Q. Okay. And so your --your criticism against PeaceHealth is that it did not do enough to make sure its policy was carried out. Is that a fair statement?
>
> A. It -- their -- yes. Their staff, employees, did not follow through on the sequence of steps that are needed according to their own policy.

CP at 138-39.

In opposition to the motion, Sedgley argued that corporate negligence in a medical malpractice action includes the breach of a hospital's duty to supervise its employees. Specifically, Sedgley stated that her theory of corporate negligence was that PeaceHealth negligently trained and supervised its staff in the implementation of its own internal procedures for reporting critical lab test results in a timely manner. Sedgley argued that "the hospital had an adequate policy but failed to make sure that its employees followed it." CP at 164. Sedgley also argued that a declaration she submitted from Dr. Patel raised a factual dispute that precluded summary judgment.

In his declaration, Dr. Patel stated that he was asked to evaluate whether PeaceHealth "deviated from the standard of care with respect to the failure to implement its Critical Lab Results policy and supervise its staff to ensure that the policy is being followed." CP at 189. His opinion was that "PeaceHealth was negligent in failing to implement the Critical Lab Results policy and supervise its staff to ensure that the policy was followed. This resulted in PeaceHealth failing to meet the applicable standard of care in informing Mr. Chad Randall of the blood culture." CP at 189.

Dr. Patel stated, "PeaceHealth's had a duty to supervise the nursing staff in the emergency room to ensure that they were following the written critical lab results policy." CP at 191. He further stated,

> After reviewing the testimony of Jon Olson, it is my opinion, based on reasonable probability that *the written policy in place regarding critical lab results was not implemented, executed, taught, enforced, or monitored for compliance.* This is evidenced by the fact that nursing staff including Jon Olson were not aware of the policy and had not received any training on the policy (let alone frequent or consistent training) and did not follow the policy in this case. The written policy was never operationalized, and the unwritten practice that Olson described as actually being in use was inadequate to operationalize the hospital's written standard.

CP at 190 (emphasis added).

In its reply brief, PeaceHealth argued that Sedgley's theory of corporate negligence failed as a matter of law because there is no duty to adopt policies and procedures. Therefore, PeaceHealth claimed that there could not be corporate negligence for not following those policies or procedures. In addition, PeaceHealth argued that Dr. Patel's declaration related to the standard of care for an individual provider, not PeaceHealth's corporate negligence. Finally, PeaceHealth argued that a negligent training or supervision claim can only exist where a person acts outside the scope of their employment. Because Olson and the other medical providers in

8

the case were PeaceHealth employees, PeaceHealth argued that Patel's declaration could not be used to prove PeaceHealth's corporate negligence through negligent supervision.

The trial court granted PeaceHealth's motion for partial summary judgment and dismissed Sedgley's corporate negligence claim.

*Expert Witness Disclosures*

Sedgley disclosed several expert witnesses and the scope of their proposed testimony. In addition to Dr. Patel, Sedgley stated she would call Dr. Alan Langman, an ENT, as an expert witness. Sedgley stated that Dr. Langman would testify that "Dr. Adam Wilson breached the standard of care in his consultation regarding Chad Randall on March 5, 2021." CP at 823. Regarding causation, Sedgley disclosed that Dr. William Ehni would testify that "the delay from the failure to contact Chad Randall was a proximate cause of a seven hour delay in treatment; if Chad Randall had been contacted, he likely would have received treatment earlier and would have survived." CP at 823.

Sedgley also disclosed that she planned to call Dr. Zlatan Coralic, a pharmacist. Sedgley stated that Dr. Coralic would testify as to how Dr. Cooper breached the standard of care by not immediately contacting the PeaceHealth emergency department after she received Randall's blood test results to clarify that Randall had been contacted and had received appropriate care. Sedgley's expert testimony disclosure did not state that Coralic would testify as to any other element of a medical negligence claim.

PeaceHealth disclosed that it would call Dr. Ali Olyaei as an expert witness on the standard of care and causation, and Dr. Olyaei's testimony would include that "it does not appear that earlier medication administration would have changed the outcome for this patient." CP at 1970. PeaceHealth also disclosed that Dr. Olyaei would provide potential rebuttal testimony that

ciprofloxacin would be "expected to successfully treat otitis media or potential mastoiditis including potential streptococcus pneumoniae." CP at 1971.

*Motions in Limine*

Before trial, PeaceHealth filed a motion in limine to exclude Dr. Coralic's entire expert testimony. Among other things, PeaceHealth argued that Dr. Coralic provided no causal link between his criticism of Dr. Cooper's conduct and Randall's death. PeaceHealth argued that Dr. Coralic did not explain how it would have made any difference to contact the emergency department over two hours after the blood test results were reported and after Olson already had reviewed the results. And Sedgley's expert witness on causation, Dr. Ehni, stated in a deposition that his causation opinion was based on a six to seven hour delay in administering intravenous antibiotics to Randall. He stated that Randall should have received antibiotics before 6:00 AM rather than 11:47 AM, and "six hours earlier would have significantly improved his chances." CP at 1101. But Dr. Cooper saw the result at 6:22 AM, four and a half hours before Randall returned to the hospital around 11:00 AM.

The trial court granted PeaceHealth's motion and excluded Dr. Coralic's testimony.

PeaceHealth also moved to exclude the TEAMS messages between Dr. Cooper and Dr. Okerson. PeaceHealth argued that these messages were irrelevant and unfairly prejudicial because Sedgley could not pursue a claim against Dr. Cooper. PeaceHealth also argued that Dr. Cooper and Dr. Okerson could not testify about ENT subspecialities such as middle ear infection and treatment. The trial court granted the motion in part. The court excluded the messages from March 8, 2021. The court stated that Dr. Cooper's feelings were irrelevant, and the remaining messages were based on inaccurate information that the blood test results were reported at 11:00 PM the previous day.

10

During trial, the trial court also excluded as prejudicial the March 6 message that said ciprofloxacin was a "weird recommendation." Rep. of Proc. (RP) at 1374.

*Exclusion of Dr. Langman's Misdiagnosis Testimony*

During her opening statement, Sedgley stated that Dr. Wilson "[m]isdiagnose[d] Chad Randall with an outer ear infection." RP at 719. Sedgley also referred to Randall's care as "a misdiagnosis." RP at 722.

Before Dr. Langman testified, PeaceHealth moved to exclude testimony from Dr. Langman about misdiagnosis because it was never a part of his disclosed expert testimony. PeaceHealth stated that Dr. Langman had never given opinions about misdiagnosis at any time. The trial court reserved ruling on the issue until the next day of trial and allowed Dr. Langman to testify as to his background for the remainder of the day. The court also asked Sedgley to identify what Dr. Langman's disclosed expert opinion was.

Dr. Langman then testified as to a "crack" in Randall's anatomy that put him at greater risk of a middle ear infection. RP at 797. PeaceHealth objected to the testimony as new expert opinion. The trial court asked Sedgley if Dr. Langman's opinion about Randall's preexisting condition causing greater risk of infection was disclosed to PeaceHealth and agreed to hear argument on it the next day.

The next day, PeaceHealth filed a written motion to exclude undisclosed opinions from Dr. Langman. PeaceHealth argued that Dr. Langman's opinion about a misdiagnosis of a middle ear infection was not disclosed by Dr. Langman or any of Sedgley's experts. Rather, Sedgley's expert disclosures were that Dr. Wilson and Dr. Isakovic pursued the wrong course of treatment for the diagnosed condition.

In support of its motion to exclude Dr. Langman's testimony, PeaceHealth attached

Sedgley's expert witness interrogatory answers. The disclosure stated,

> Dr. Langman will provide testimony that Dr. Adam Wilson breached the standard of care in his consultation regarding Chad Randall on March 5, 2021. The CT scan of that date references otomastoiditis and history of mastoiditis and headache. This information indicates the need to investigate further and rule out meningitis. Mild mastoiditis does not cause headache. It can cause an earache but not headache. Cipro is not the drug of choice for acute ear infection or mastoiditis and is not a first or even a second line therapy for mastoiditis. A further indication for hospital admission is the worsening infection on appropriate antibiotics.

CP at 1791-92.

PeaceHealth also submitted Dr. Langman's deposition. In his deposition, Dr. Langman

stated,

> Q. Have we covered all of your standard-of-care criticisms you're going to be offering in this case?
>
> A. I think that-- I'm trying to go back through this. I mean, my-- my criticisms are that -- that Dr. Wilson chose not to physically see the patient, which, by itself, is not a breach of the standard of care, but because he did that, he relied essentially on what was told to him verbally, and he made decisions based on the X-ray report, and the decisions he made were incorrect.
>
> Q. And specifically, when you say "the decisions," you mean the decision not to recommend hospital admission or not to see the patient in person to conduct eardrum lancing and further evaluation?
>
> A. That would be correct, yes.
>
> Q. Okay.
>
> A. And also not to -- or to totally ignore the -- the headache issue.
>
> Q. Okay. And so just to be clear, when you say "to ignore the headache issue," that's really part and parcel of your other opinions; right? It's -- the headache is a symptom that goes into the consideration of whether or not to admit the patient or whether or not to conduct an eardrum lancing; correct?
>
> A. Or to do further evaluation.
>
> Q. Okay.

A. Correct.

Q. With those points then discussed, does that encompass the entirety of your standard-of-care criticisms?

A. Yes.

Q. Okay. Are you going to testify that, if Mr. Randall had been admitted to the hospital on March 5th, that, on a more-probable-than-not basis, he would be alive today?

A. He would have had a better chance of being alive today but even patients with -- who -- with appropriately treated meningitis, there's about a 20 percent death rate. So there's -- there's obviously no guarantee there.

CP at 1806-07.

The trial court stated that PeaceHealth's motion "focuses on the potential timing of disclosure and whether or not it's appropriate to limit the testimony in these potential areas." RP at 836. The court noted that there were written discovery requests and a deposition of Dr. Langman. In addition, the court's scheduling orders "did require a disclosure and identification of experts, including their opinions and basis for opinions." RP at 837.

The trial court continued,

It does not appear to me that the issue regarding a failure to diagnose issues connected with the middle ear and/or the existence of some crack in connection with Mr. Randall were previously identified either in the written discovery responses, in the deposition responses, or in the identification of the witness disclosure. . . . I read and review that, those items are not specifically identified.
. . . .
So, to provide testimony at this point that would go to a standard of care criticism not previously disclosed I believe does violate both the civil rule discovery obligation as well as the Court's order that was put in place.
. . . .
Now, the significance and relative value of [misdiagnosis opinion and the crack in Randall's skull] doesn't necessarily mean that I treat those differently. It's a real issue of prejudice, in the end, and how that comes into play. Here, I think there is prejudice as to both of those issues because of the timing of the disclosures. We're talking about disclosures made at trial that limits and impacts the other parties'

13

ability to properly prepare for cross examination. It also limits the parties' ability to properly prepare counterarguments from their own experts in connection to that. . . . .
I don't think that there are appropriate remedies available other than limiting those opinions from being presented, because continuation at this point doesn't make sense in the context of where we are. Allowing a break for further depositions or exploring those opinion I don't think is an appropriate course where those have already been made available and had an opportunity to disclose those. I think the least restrictive alternative here does go to a limitation of testimony that it sounds like the plaintiff was planning to present.

So, for those reasons, I'm going to grant the defendants' motion on that point as follows. I'm not saying that there cannot be any testimony as it relates to the treatment, certainly . . . . What I am saying is, in my view, it is going to a new opinion when we're talking about the middle ear infection being a standard of care violation. I think the reference to a misdiagnosis is a term that I'm going to limit and preclude as well because I think the issue of misdiagnosis directly brings in and connotes an issue of breach of standard of care.

RP at 838-41.

*Plaintiff's Expert Testimony*

Sedgley presented two expert witnesses on the standard of care for improper treatment: Dr. Langman and Dr. Patel.

Dr. Langman testified that Dr. Wilson breached the standard of care for an ENT by sending Randall home on ciprofloxacin instead of starting intravenous antibiotics. Dr. Langman also stated that he had never seen a patient prescribed ciprofloxacin for a middle ear infection. He stated that the proper approach would have been to admit Randall to the hospital and treat him with cephalosporin. Dr. Langman did not mention the standard of care for Dr. Isakovic or any other medical care providers during his testimony.

Dr. Patel is an emergency room physician who provided expert testimony on the standard of care regarding emergency room procedures and practices. He testified that Dr. Isakovic breached the standard of care for an emergency room physician by sending Randall home with antibiotics.

14

Dr. Patel addressed PeaceHealth's written policy regarding critical test results, which required staff to notify a physician immediately. Dr. Patel testified that a lab technician communicated with the emergency room, but there is no indication in the medical records that a physician ever was contacted. He also stated that a critical lab result for strep pneumoniae should have warranted an immediate call to the patient to get him back to the hospital.

In addition, Dr. Patel also testified that the relevant standard of care for nurses in emergency departments receiving critical test results was breached. Dr. Patel stated, "[PeaceHealth's] own internal policies are well written according to national standards. They were simply not followed. It began well in the lab when the lab technician contacted the ER staff . . . . After that, . . . they dropped the ball." RP at 1168. Dr. Patel did not identify a specific nurse who failed to follow the procedures. But on cross-examination, Dr. Patel testified that Olson was the only provider for whom he was offering criticism based on the nursing standard of care.

Also on cross-examination, Dr. Patel confirmed that he was not commenting on the standard of care with respect to any pharmacist.

Dr. Ehni testified regarding causation. His expert opinion was that Randall would have survived if he had been hospitalized with antibiotics on March 5. Dr. Ehni did not specifically testify whether Randall would have survived if he had come to the emergency room earlier in the morning on March 6. However, he did say that a delay of six hours in receiving treatment would result in a high risk of death.

*Vanderpool Testimony*

Michelle Vanderpool testified as an expert in nursing for PeaceHealth. She testified that the procedure for communicating blood culture test results was unique from communicating

15

other test results because it can take multiple days to receive blood culture test results.  She also testified that positive blood culture results usually will go to an emergency department pharmacist, not an emergency department nurse.  She then reviewed the medical record and stated,

> I think it was Jason Scott and John Olsen's [sic] . . . you can see that Jason Scott calls down to the emergency room . . . I don't know if he says specifically John [sic] in there or if he just says notified staff.  And then in that, he also notates that he faxed it or tubed it down [to the emergency room].

RP at 2240.

Vanderpool also testified that although there was no documentation of what Olson did with Randall's blood test results once he received them, it was her expert opinion that Olson did not violate the standard of care because emergency departments do not usually have an active medical chart for a patient who had been discharged while awaiting blood culture test results.

On cross examination, Vanderpool gave the following testimony,

Q  So this phone call by Jason Scott . . . you agree that that was received by someone in the emergency department, right?

A.  Yes.

Q.  We don't know -- actually know who that is, correct?

A.  Yeah, we don't know specifically.

Q.  Okay. It could've been a nurse other than John Olsen [sic], right?

A.  It could have been.
. . . .

Q.  And that may have been John Olsen [sic], it may have been someone else entirely, correct?

A.  It could be.

Q.  Whoever that person is has the obligation under PeaceHealth's policy to immediately tell the doctor, right?

16

A.  Mm-hmm, yes.

RP at 2254-55.

*PeaceHealth's CR 50 Motion*

During the defendants' presentation of testimony, PeaceHealth filed a motion for partial judgment as a matter of law under CR 50.  PeaceHealth argued that Sedgley "failed to support any claims of a purported standard of care violation predicated on the conduct of any providers other than Dr. Wilson, Dr. Isakovic, and RN Olson."  CP at 1984.  PeaceHealth argued that because Dr. Langman's testimony was limited to Dr. Wilson's decision not to admit Sedgley to the hospital and Dr. Patel's testimony was limited to Olson's communication of Randall's blood test results, Sedgley failed to provide any evidence that any other unidentified PeaceHealth employees breached the standard of care.

Sedgley argued that Dr. Patel's testimony showed that another unidentified nurse who received Randall's blood test results breached the standard of care.  Sedgley argued that she did not need to identify a specific nurse who acted negligently because some nurse must have received Randall's blood culture results.  She also argued that Vanderpool stated that some unidentified nurse could have received the information and not communicated it.

The trial court granted PeaceHealth's CR 50 motion.  The court's order stated, "Based on the evidence presented in Plaintiff's case, there is no competent expert testimony evidencing purported negligence by any persons other than Dr. Wilson, Dr. Isakovic, and Jon Olson, RN."  CP at 2023.  The court dismissed with prejudice any claims "predicated on a pharmacy standard of care, or the care of any other unidentified providers."  CP at 2023.

*Exclusion of Dr. Coralic's Rebuttal Testimony*

On behalf of the defendants, Dr. Olyaei testified that even if Randall had been admitted to the hospital on March 5, he would not have survived due to his infection. He stated that oral and intravenous ciprofloxacin have the same effectiveness. In response to a jury question, Olyaei testified that there essentially is no difference for most diagnoses of being treated with ciprofloxacin or levofloxacin, another antibiotic.

On rebuttal, Sedgley stated that she intended to call Dr. Coralic as a rebuttal witness on various medical issues testified to by defense experts, including Dr. Olyaei's testimony about ciprofloxacin and levofloxacin having essentially identical coverage.

PeaceHealth objected, arguing that Dr. Coralic had been disclosed as an expert only regarding the pharmaceutical standard of care. PeaceHealth emphasized that Dr. Coralic stated in his deposition that he would not be testifying about any causation issues and would only be testifying about pharmacy issues. PeaceHealth also pointed out that Dr. Coralic did not offer proper rebuttal evidence because Sedgley had her own infectious disease expert in her case-in-chief. PeaceHealth concluded that Dr. Coralic was never disclosed as an expert on other medical issues, and that allowing him to testify violated the various motions in limine and rules requiring disclosure of expert opinions.

Sedgley responded that the disclosure rules did not apply to rebuttal witnesses, and the defense had raised new issues in their case-in-chief that needed to be addressed.

The trial court excluded Dr. Coralic from presenting rebuttal testimony. The court stated,

> Dr. Coralic was identified as an expert witness by the Defense. . . . The specific scope of Dr. Coralic's testimony was identified to be pretty simple and straightforward focusing on the "standard of care."

> The issues related to standard of care for the testimony of that witness was then dispositively resolved in relation to PeaceHealth and Dr. Wilson's Motion in Limine

No. 1 that I granted that precluded testimony from Dr. Coralic because it was focused on pharmaceutical standard of care that was not part of the case.

At that point, it eliminated Dr. Coralic's involvement with the case. No indication otherwise that Dr. Coralic would be involved. And, in fact, then the plaintiff's [sic], following a motion to compel from the Defense filed an updated witness list on April 19th of 2024, did not include Dr. Coralic within that information.

There was also then a Motion in Limine No. 17 that was granted. This was plaintiff's motion in limine that precluded the testimony of any undisclosed experts. . . . .

Dr. Coralic was not identified and has not been disclosed as an expert up until this point to the Defense. It is only then yesterday at the end of the day that Dr. Coralic was identified as wanting to be called as an expert as a rebuttal witness. Now, to me, that violates the issue of the Motion in Limine No. 17, plaintiff's own position as identifying an undisclosed expert. Also a violation of the Court's order regarding the timing of expert disclosures.

Now, the role of a rebuttal witness is different than that of someone who's testifying in a case in chief. But, when we're talking about the issue of an expert and the issues that are involved in this particular [] case, I'm reticent to have an expert testify in rebuttal that has not been disclosed in any way to the Defense. I believe that does constitute a willful violation of both the motion in limine and the Court's prior orders.

I think there is prejudice directly to the Defense because there is not an opportunity to prepare, or evaluate, or explore the -- the testimony of Dr. Coralic or the information that would be presented. There was certainly an exploration of that within the context of the pharmaceutical standard of care, but that's a different type of issue than what's being talked about here as a rebuttal witness.

I will note that the Court order identifies that any person intended to be called at trial should be disclosed. . . . I think the prejudice on timing, finding out 12 hours before the person would be called to testify, longer than that actually, 16 I suppose. Still, not time to identify or properly prepare.

As far as other alternatives are concerned or lesser sanctions if you will. We're in the rebuttal portion of the case. There's not an opportunity to continue this further to explore exploration of those opinions. To me, the opinions that Dr. Coralic apparently would testify on rebuttal, they're not a surprising list of events given the knowing facts in this case, the discovery that's been completed, and where the case has moved forward.
. . . .

So, for those issues I think it's appropriate and I so find to exclude Dr. Coralic from testifying in rebuttal.

RP at 2988-91.

*Verdict and Appeal*

The jury found that neither Dr. Wilson, Dr. Isakovic, nor Olson acted negligently in treating Randall. The trial court entered a final judgment dismissing Sedgley's claims with prejudice. Sedgley appeals the trial court's final judgment.

ANALYSIS

A.     LEGAL PRINCIPLES – MEDICAL NEGLIGENCE

A plaintiff can establish medical negligence by showing that a health care provider failed to follow the accepted standard of care. RCW 7.70.030(1). In addition, a necessary element of a medical negligence claim is that this failure was a proximate cause of the plaintiff's injury. RCW 7.70.040(1)(b).

In a medical negligence action, expert testimony generally is necessary to establish both the standard of care and causation. *Frausto v. Yakima HMA, LLC*, 188 Wn.2d 227, 231-32, 393 P.3d 776 (2017). With regard to the standard of care, a plaintiff must show that "[t]he health care provider failed to exercise that degree of care, skill, and learning expected of a reasonably prudent health care provider at that time in the profession or class to which he or she belongs, in the state of Washington, acting in the same or similar circumstances." RCW 7.70.040(1)(a). An expert must establish the applicable standard of care and explain how the provider acted negligently by breaching that standard. *Reyes v. Yakima Health Dist.*, 191 Wn.2d 79, 86-87, 419 P.3d 819 (2018). In other words, the expert must state what a reasonable medical provider would or would not have done under the circumstances and that the defendant medical provider acted or

20

failed to act in that manner. *Collins v. Juergens Chiropractic, PLLC*, 13 Wn. App. 2d 782, 793, 467 P.3d 126 (2020).

To establish causation, "[t]he expert must show that the failure to comply with the applicable standard of care proximately caused the harm incurred." *Sartin v. Est. of McPike*, 15 Wn. App. 2d 163, 184, 475 P.3d 522 (2020). Expert testimony on medical causation must be expressed in terms of " 'reasonable medical certainty or reasonable medical probability.' " *Desranleau v. Hyland's, Inc.*, 26 Wn. App. 2d 418, 438, 527 P.3d 1160, *review denied,* 1 Wn.3d 1030 (2023) (quoting *Anderson v. Akzo Nobel Coatings, Inc.*, 172 Wn.2d 593, 607, 260 P.3d 857 (2011)). Such testimony must go beyond a mere possibility to meet the standard of reasonable medical probability. *Desranleau*, 26 Wn. App. 2d at 438.

B.      SUMMARY JUDGMENT – CORPORATE NEGLIGENCE

Sedgley argues that the trial court erred by granting summary judgment in favor of PeaceHealth on Sedgley's corporate negligence claim. We conclude that any error in granting partial summary judgment is mooted by the jury's verdict that Olson was not negligent.

1.      Standard of Review

We review summary judgment orders de novo. *Mihaila v. Troth*, 21 Wn. App. 2d 227, 231, 505 P.3d 163 (2022). We view all evidence in the light most favorable to the nonmoving party, including reasonable inferences. *Id.* Summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Id.* A genuine issue of material fact exists if reasonable minds can come to different conclusions on a factual issue. *Id.* We consider "only evidence and issues called to the attention of the trial court" when reviewing a summary judgment motion. RAP 9.12.

The moving party has the initial burden of showing the absence of a genuine issue of material fact. *Sartin*, 15 Wn. App. 2d at 172. A moving defendant can meet this burden by demonstrating that the plaintiff cannot support their claim with any competent evidence. *Id.* If the defendant makes such a showing, the burden shifts to the plaintiff to present evidence that creates a genuine issue of material fact. *Id.* "Summary judgment is appropriate if a plaintiff fails to show sufficient evidence that creates a question of fact about an essential element on which he or she will have the burden of proof at trial." *Id.*

A material opinion from an expert generally is sufficient to create a question of fact and defeat summary judgment. *Strauss v. Premera Blue Cross*, 194 Wn.2d 296, 301, 449 P.3d 640 (2019). But an expert's opinion must be based on facts, and opinions based solely on speculation or assumptions will not preclude summary judgment. *Id.*

### 2. Corporate Negligence Principles

Under a theory of corporate negligence, a hospital has " 'a nondelegable duty owed directly to the patient, regardless of the details of the doctor-hospital relationship.' " *Est. of Essex v. Grant County Pub. Hosp. Dist. No. 1*, 3 Wn.3d 1, 15, 546 P.3d 407 (2024) (quoting *Pedroza v. Bryant*, 101 Wn.2d 226, 229, 677 P.2d 166 (1984)). "[A] hospital's liability under a theory of corporate negligence is separate from its vicarious liability under the nondelegable duty doctrine." *Essex*, 3 Wn.3d at 15. Washington law first recognized a theory of corporate negligence in medical malpractice claims because "[p]laintiffs found it difficult to recover . . . as courts tended to classify physicians as independent contractors for whose acts the hospital was not liable." *Pedroza*, 101 Wn.2d at 230.

A successful corporate negligence claim, like any negligence claim, requires "(1) the existence of a duty owed to the complaining party, (2) a breach of that duty, (3) a resulting injury,

and (4) proximate cause between the breach and the injury." *Essex*, 3 Wn.3d at 14. Corporate negligence is a theory of medical negligence under RCW 7.70.040(1) that requires expert testimony to show a breach of an established standard of care. *See id.* at 13-15. The standard of care for a hospital " 'is that of an average, competent health care facility acting in the same or similar circumstances' " *Id.* at 14 (quoting *Ripley v. Lanzer*, 152 Wn. App. 296, 324, 215 P.3d 1020 (2009)).

In *Essex*, the Supreme Court expressly declined to limit corporate negligence claims to claims concerning incompetent staff, doctor's privileges in hospitals, hospital supply and equipment, and the failure to intervene. 3 Wn.3d at 15-16. The court referenced the comment to the pattern jury instruction for corporate negligence as "allowing counsel to argue the existence of any duty 'the court finds legally applies and is supported by the evidence.' " *Id.* (quoting 6 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL § 105.02.02, at 606 (7th ed. 2019)). Under the facts of that case, the court concluded that Essex presented sufficient evidence of the hospital's "negligence in retaining, training, and overseeing its nurses" to avoid summary judgment. *Essex*, 3 Wn.3d at 16.

3. Mootness

PeaceHealth argues that Sedgley's corporate negligence claim is mooted by the jury's verdict that Olson was not negligent. We agree.

In *Bundrick v. Stewart*, Bundrick consented to surgery but claimed that she placed a limitation on that consent – that a resident would observe but not participate on the surgery. 128 Wn. App. 11, 14, 19, 114 P.3d 1204 (2005). The trial court dismissed on summary judgment claims against the hospital where the surgery was performed based on the failure to obtain informed consent. *Id.* at 15. After trial, the jury returned a special verdict against the surgeon

23

because he was negligent, but not because he failed to obtain Bundrick's informed consent to the resident's participation. *Id.* at 15-16.

This court concluded that the trial court erred in granting summary judgment in favor of the hospital because there was a question of fact as to whether Bundrick limited her consent. *Id.* at 19. However, the court did not reverse because the issue of whether Bundrick consented to the resident's participation was tried to the jury. *Id.* The court stated, "[T]he jury's finding on the informed consent issue decided the fact question dispositive of [Bundrick's] claim. Although summary judgment on this issue was improper, the verdict disposes of the claim." *Id.* at 20.

In *Carson v. Ashbach*, Carson asserted a corporate negligence claim against a hospital based on the alleged failure to train and supervise Dr. Ashbach regarding obtaining informed consent. No. 86049-6-I, slip op. at 14 (Wash. Ct. App. May 19, 2025) (unpublished), https://www.courts.wa.gov/opinions/pdf/860496.pdf. The jury found that the doctor was not negligent in failing to obtain informed consent. *Id.* The court concluded, "Because Dr. Ashbach did not fail to obtain informed consent, any negligence by [the hospital] in training or supervising Dr. Ashbach's informed consent practices could not have proximately caused injury to Carson." *Id.* at 14-15.

At summary judgment, Dr. Patel's declaration stated that PeaceHealth had a duty to ensure that its emergency rooms nurses were following the written critical lab results policy. He stated the following opinion:

> After reviewing the testimony of Jon Olson, it is my opinion, based on reasonable probability that *the written policy in place regarding critical lab results was not implemented, executed, taught, enforced, or monitored for compliance.* This is evidenced by the fact that nursing staff including Jon Olson were not aware of the policy and had not received any training on the policy (let alone frequent or consistent training) and did not follow the policy in this case.

CP at 190 (emphasis added).

24

We assume without deciding that Dr. Patel's expert opinion was sufficient to establish a genuine dispute of fact regarding corporate negligence that should have defeated summary judgment. *See Strauss*, 194 Wn.2d at 301. But the jury heard the same testimony. Dr. Patel testified that the relevant standard of care for nurses in emergency departments receiving critical test results was breached. He stated that after the lab technician contacted the ER staff, "they dropped the ball." RP at 1168. Dr. Patel did not identify a specific nurse who failed to follow the procedures, but he confirmed that Olson was the only provider for whom he was offering a criticism based on the nursing standard of care.

The jury found that Olson was not negligent in administering Randall's care. And as discussed below, the trial court did not err in dismissing any claims against unidentified PeaceHealth nurses. Any negligent failure by PeaceHealth to implement it critical lab report policy through training and supervision could not have proximately caused Randall's death. *See Bundrick*, 128 Wn. App. at 20. Therefore, the jury's resolution of Sedgley's negligence claim against Olson also was dispositive of her corporate negligence claim against PeaceHealth.

Accordingly, we hold that Sedgley's corporate negligence claim against PeaceHealth is mooted by the jury's verdict.[3]

C.     EXCLUSION OF PHARMACIST STANDARD OF CARE TESTIMONY

Sedgley argues that the trial court erred in granting PeaceHealth's motion in limine to exclude Dr. Coralic's testimony about the pharmacist standard of care. We disagree.

---

[3] Because of this holding, we do not address PeaceHealth's argument that a party may not pursue a corporate negligence claim based on negligent training and supervision when an employer has conceded that an employee acted within the scope of their employment. *See Evans v. Tacoma School Dist. No. 10*, 195 Wn. App. 25, 47, 380 P.3d 553 (2016) ("[A]n injured party generally cannot assert claims for negligent hiring, retention, supervision or training of an employee when the employer is vicariously liable for the employee's conduct.").

1. Standard of Review

Sedgley argues that we should review the trial court's ruling on the motion in limine de novo, the same as an order granting summary judgment, because it effectively dismissed her claim against PeaceHealth's pharmacist, Dr. Cooper. We agree.

We normally review the grant or denial of a motion in limine for an abuse of discretion. *Gunn v. Riely*, 185 Wn. App. 517, 531, 344 P.3d 1225 (2015). However, when a pretrial motion has the effect of a dispositive motion, we will treat the motion in limine as a summary judgment motion for the purpose of appellate review. *Havens v. C & D Plastics, Inc.*, 124 Wn.2d 158, 176, 876 P.2d 435 (1994); *see also Janson v. North Valley Hosp.*, 93 Wn. App. 892, 901, 971 P.2d 67 (1999) (applying the summary judgment standard to an appeal of a motion in limine that determined an element of a claim as a matter of law). We review a trial court's decision on a summary judgment motion de novo. *Mihaila*, 21 Wn. App. 2d at 231.

Here, the exclusion of Dr. Coralic's testimony precluded Sedgely from presenting any testimony about the standard of care for pharmacists from Sedgley's case. This effectively dismissed any medical negligence claim against a pharmacist for Randall's death as well as PeaceHealth's vicarious liability for its pharmacist's alleged negligence. Therefore, the motion in limine to exclude Dr. Coralic's testimony was dispositive of the pharmacist negligence claim. Accordingly, we apply the de novo summary judgment standard to the trial court's ruling on Dr. Coralic's testimony.

2. Analysis

a. Procedural Argument

Sedgley argues that we should reverse the trial court's motion in limine ruling because it was made without the procedural protections of CR 56, such as 28 day notice and more time to

respond. But the trial court did not rule on a summary judgment motion. Rather, it ruled on an evidentiary issue in a way that disposed of an element of Sedgley's claim. It was not unreasonable for the trial court to treat PeaceHealth's motion in limine as it would in the ordinary course of litigation. In any event, we are reviewing the court's ruling de novo, which moots any claim that a procedural error prejudiced Sedgley.

Accordingly, we reject Sedgley's procedural argument.

      b.    Substantive Argument

Sedgley argues that she presented a genuine issue of material fact regarding causation for Dr. Cooper's alleged negligence. We disagree.

Here, Dr. Coralic's expert opinion was that Dr. Cooper violated the standard of care for a pharmacist by not contacting the emergency department when she saw the critical lab result at 6:22 AM. Viewed in the light most favorable to Sedgley, we assume without deciding that this opinion created a genuine factual dispute of whether Dr. Cooper violated the standard of care.

However, Dr. Coralic's expert disclosure and deposition did not show how Dr. Cooper's alleged failure to contact the emergency department proximately caused Randall's death. By the time Dr. Cooper saw the critical blood test result at 6:22 AM, Olson already had seen the result and attempted to contact Randall. There is no indication that Dr. Cooper contacting Olson over an hour later would have made any difference. In addition, the causation testimony from Dr. Ehni was that contacting Randall six or seven hours earlier (than when he returned at 11:00 AM) would have improved his chances. But Dr. Cooper did not see the test result until four and a half hours before Randall returned. Dr. Ehni did not say that contacting Randall at 6:30 AM would have made a difference.

Sedgley claims that she "presented evidence that if Ms. Cooper had acted when she received the results at 6:22 AM, Mr. Randall would still be alive." Br. of Appellant at 57. But Sedgley provides no record citation for that claim.

Accordingly, we hold that the trial court did not err when it excluded Dr. Coralic's testimony.[4]

D.      EXCLUSION OF EXPERT TESTIMONY AS DISCOVERY SANCTION

Sedgley argues that the trial court erred in excluding as discovery sanctions (1) Dr. Langman's expert testimony about potential misdiagnosis, and (2) Dr. Coralic's rebuttal testimony regarding antibiotics. We disagree.

1.      Legal Principles

CR 26(b)(5)(A)(i) states,

> A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion, and to state such other information about the expert as may be discoverable under these rules.

In addition, the trial court's scheduling orders required the parties submit expert witness disclosures, which included their opinions and basis for opinions.

Under CR 37(b)(2), the trial court has discretion to impose sanctions against a party who fails to comply with a discovery order. Available sanctions include the exclusion of evidence. CR 37(b)(2)(B).

Before excluding untimely disclosed evidence as a sanction, the trial court must consider the factors set forth in *Burnet v. Spokane Ambulance*, 131 Wn.2d 484, 494, 933 P.2d 1036

---

[4] Because of this holding, we do not address PeaceHealth's argument that Dr. Coralic lacked the foundation to testify to the Washington standard of care for pharmacists.

(1997). *Keck v. Collins*, 184 Wn.2d 358, 368, 357 P.3d 1080 (2015). The *Burnet* factors are (1) whether the violation was willful or deliberate, (2) whether the violation substantially prejudiced the opposing party's ability to prepare for trial, and (3) whether lesser sanctions probably would suffice. *Jones v. City of Seattle*, 179 Wn.2d 322, 338, 314 P.3d 380 (2013) (citing *Burnet*, 131 Wn.2d at 494).

The trial court must make express findings regarding the *Burnet* factors on the record. *Teter v. Deck*, 174 Wn.2d 207, 217, 274 P.3d 336 (2012). The court in *Teter* stated, "We cannot emphasize too forcefully the importance of adequate findings to support more severe discovery sanctions such as exclusion of a witness." *Id.* at 210. However, "the mere fact that a trial court does not cite *Burnet* before excluding witnesses is not dispositive; a colloquy might satisfy *Burnet* in substance even if the judge fails to invoke that case by name." *Jones*, 179 Wn.2d at 344.

A trial court exercises broad discretion in imposing discovery sanctions, and we review these sanctions for abuse of discretion. *Magaña v. Hyundai Motor Am.*, 167 Wn.2d 570, 582, 220 P.3d 191 (2009). "An appellate court can disturb a trial court's sanction only if it is clearly unsupported by the record." *Id.* at 583.[5]

2.   Dr. Langman's Misdiagnosis Testimony

Sedgley argues that the trial court erred by excluding Dr. Langman's testimony about how Dr. Wilson misdiagnosed Randall's middle ear infection without a proper consideration of the *Burnet* factors. We disagree.

---

[5] Initially, PeaceHealth argues that a strict application of the *Burnet* factors is not required when a trial court excludes newly disclosed testimony in the middle of a trial as opposed to before trial. Because we hold below that the trial court adequately addressed the *Burnet* factors and did not abuse its discretion in excluding Dr. Langman's misdiagnosis testimony and Dr. Coralic's rebuttal testimony, we do not address this issue.

Here, although the trial court did not expressly reference *Burnet*, the court considered all of the *Burnet* factors before it excluded Dr. Langman's testimony about Dr. Wilson's alleged misdiagnosis of a middle ear infection. First, a violation is willful or deliberate if it "without reasonable excuse or justification." *Magaña*, 167 Wn.2d at 584. The court's ruling stated that both the civil rules and pretrial orders regarding disclosure of expert testimony were clear to the parties. The court then analyzed the relevant disclosures and depositions and found that Sedgley never disclosed that Dr. Langman would offer an expert opinion on misdiagnosis or Sedgley's condition with respect to a crack in his skull. The court also discussed that Langman's testimony was new expert opinion coming up during trial.

Sedgley argues that the trial court failed to expressly find that Sedgley's failure to disclose Dr. Langman's misdiagnosis testimony was willful or deliberate. She claims that the trial court was required to explicitly state that a discovery violation was "willful or deliberate". But the trial court was not required to use the specific words "willful" or "deliberate" in its oral ruling for us to find that the trial court satisfied the first *Burnet* requirement. *See Jones*, 179 Wn.2d at 344. Although the trial court could have been more specific, we conclude that the trial court's oral ruling reflects a finding that Sedgley's failure to disclose Dr. Langman's misdiagnosis testimony was willful or deliberate.

Second, the trial court discussed the prejudice to PeaceHealth and Dr. Isakovic. The court found that the failure to disclose misdiagnosis testimony impacted PeaceHealth and Dr. Isakovic's ability to prepare both cross-examination and their own expert testimony. The court also found that because trial had already started, PeaceHealth and Dr. Isakovic could not reasonably conduct additional depositions or discovery. The court adequately considered the

second *Burnet* factor and found that the lack of disclosure substantially prejudiced PeaceHealth and Dr. Isakovic.

Third, the trial court considered lesser sanctions and ruled that the omission of the undisclosed testimony was appropriate. The court noted that additional discovery and depositions – lesser sanctions – were not possible during trial, and that Dr. Langman's misdiagnosis testimony was a new theory that had not previously been discussed. The court adequately considered the third *Burnet* factor and found that exclusion of Dr. Langman's misdiagnosis testimony was the only adequate remedy.

The standard of review is abuse of discretion. *Magaña*, 167 Wn.2d at 582. We hold that the trial court did not abuse its discretion when it excluded Dr. Langman's misdiagnosis testimony as a discovery sanction.

3.    Dr. Coralic's Rebuttal Testimony

Sedgley argues the trial court erred when it did not permit Dr. Coralic to testify as a rebuttal expert witness to address Dr. Olyaei's testimony that ciprofloxacin and levofloxacin were similar drugs without a proper consideration of the *Burnet* factors. We disagree.

Although the trial court did not expressly reference *Burnet*, the court discussed those factors with respect to Dr. Coralic's proposed rebuttal testimony. First, the record reflects that the trial court found that the failure to disclose Dr. Coralic's potential expert testimony with respect to medical issues other than the pharmacy standard of care to be willful or deliberate. Sedgley disclosed that Dr. Coralic would provide expert testimony on the pharmaceutical standard of care, which the court excluded before trial. The court then noted that despite the opportunity to do so in response to PeaceHealth's disclosed experts, including Dr. Olyaei, Sedgley did not update the scope of Dr. Coralic's proposed testimony to include expert opinion

on other medical issues. The court found that Sedgley lacked reasonable excuse or justification for failing to disclose the expanded scope of Dr. Coralic's proposed expert testimony. The court adequately considered the first *Burnet* factor and found that Sedgley's failure to disclose Dr. Coralic's causation testimony was willful or deliberate.

Second, the trial court considered prejudice to the parties. Like the issue with respect to Dr. Langman's misdiagnosis testimony, this issue came up in the middle of trial. The court noted that PeaceHealth's inability to prepare for the cross-examination of Dr. Coralic with respect to other medical issues was prejudicial. And the court specifically identified that it was Dr. Coralic's rebuttal testimony that would be prejudicial because of the lack of disclosure of Dr. Coralic's rebuttal opinions. The court adequately considered the second *Burnet* factor and found that the lack of disclosure substantially prejudiced PeaceHealth and Dr. Isakovic.

Third, the trial court considered the impact of a lesser sanction. The court noted that Sedgley proposed Dr. Coralic's testimony during her rebuttal case after PeaceHealth had presented its evidence, which prevented PeaceHealth from exploring Dr. Coralic's opinions further. And similar to the testimony of Dr. Langman, it was improbable that PeaceHealth and Dr. Isakovic could conduct further deposition or discovery of Dr. Coralic's rebuttal opinions. Therefore, the trial court appropriately considered the third *Burnet* factor and found that exclusion of Dr. Coralic's rebuttal testimony on causation was the only appropriate remedy.

The standard of review is abuse of discretion. *Magaña*, 167 Wn.2d at 582. We hold that the trial court did not abuse its discretion when it excluded Dr. Coralic's rebuttal testimony as a discovery sanction.

E.       EXCLUSION OF TEAMS MESSAGES

Sedgley argues that the trial court erred in excluding certain TEAMS Messages between Dr. Cooper and Dr. Okerson.  We disagree.

1.    Legal Principles

We review a trial court's decision to grant a motion in limine for an abuse of discretion. *Gunn*, 185 Wn. App. at 531.  A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds.  *Terrell v. Hamilton*, 190 Wn. App. 489, 499, 358 P.3d 453 (2015).

Only relevant evidence is admissible.  ER 402.  Evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  ER 401.  The threshold to admit relevant evidence is low and even minimally relevant evidence is admissible. *Mut. of Enumclaw Ins. Co. v. Gregg Roofing, Inc.*, 178 Wn. App. 702, 729, 315 P.3d 1143 (2013).

However, relevant evidence may be excluded under ER 403 "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or mislead[s] the jury."  Trial courts have broad discretion in weighing the probative value of evidence against its prejudicial impact.  *Needham v. Dreyer*, 11 Wn. App. 2d 479, 493, 454 P.3d 136 (2019).

2.    Analysis

Here, the March 8 messages arguably were relevant.  If believed by the jury, the messages suggest that the critical blood test results should have been communicated to Randall sooner.

But the trial court did not abuse its discretion in excluding these messages under ER 403. Sedgley argues the March 8 messages tended to show that Dr. Cooper or another pharmacist

could have communicated the blood test results at 11:00 PM but failed to do so.[6] But it was undisputed that the record showed that the blood culture test produced results at approximately 4:00 AM. So Dr. Okerson's message about "Why ED didn't [communicate the result] I don't know. It results at 11 PM" was based on a false premise. Therefore, this message would have been confusing and misleading. CP at 1557.

Sedgley appears to argue that this could create a dispute of fact about what time the blood culture test produced a result. But the medical records showed that the blood test result arrived at 3:57 AM, not at 11:00 PM the previous day. Neither party disputed that fact.

Accordingly, we hold that the trial court did not abuse its discretion when it excluded the March 8 TEAMS messages.

F.      JUDGMENT AS A MATTER OF LAW – UNIDENTIFIED PEACEHEALTH NURSES

Sedgley argues that the trial court erred when it granted PeaceHealth's CR 50 motion for judgment as a matter of law with respect to the liability of unidentified PeaceHealth nurses. We disagree.

1.    Standard of Review

Under CR 50(a)(1), a court may grant judgment as a matter of law on an issue if "there is no legally sufficient evidentiary basis for a reasonable jury to find or have found for [the nonmoving] party with respect to that issue." This motion may be filed "any time before submission of the case to the jury." CR 50(a)(2).

---

[6] Sedgley also makes arguments that the TEAMS messages were also relevant to show that (1) ciprofloxacin was not the appropriate antibiotic to prescribe, (2) Dr. Wilson fell below the standard of care for an ENT because he was not a middle ear specialist, and (3) Randall should not have been sent home. But those TEAMS messages were from March 6 and 7, 2021, which the trial court allowed to be presented as evidence.

A CR 50 motion can be granted when there is no substantial evidence or reasonable inferences therefrom to support a verdict for the nonmoving party after viewing the evidence in the light most favorable to the nonmoving party. *Mancini v. City of Tacoma*, 196 Wn.2d 864, 877, 479 P.3d 656 (2021). Substantial evidence is evidence sufficient to persuade a fair-minded, rational person that the declared premise is true. *Id.* We review a trial court's CR 50 decision de novo. *Id.*[7]

2.   Analysis

Sedgley argues that she provided sufficient evidence for the jury to decide that unidentified PeaceHealth nurses violated the standard of care with respect to following the critical test results policy.

Initially, Sedgley argues that there is no legal requirement for her to identify a specific employee for her vicarious liability claim. PeaceHealth does not address this argument. Therefore, we assume without deciding that Sedgley's theory of liability against unidentified PeaceHealth employees is viable.

Dr. Patel was Sedgley's only expert witness who spoke to the standard of care for nurses with respect to the critical test results policy.[8] He testified that the nursing standard of care was breached because "[PeaceHealth's] own internal policies are well written according to national

---

[7] The trial court asked PeaceHealth whether the court could consider evidence in the defendants' case-in-chief as evidence for the CR 50(a) motion because PeaceHealth had already begun its presentation of testimony. Neither party makes an argument about the relevant evidence that can be considered under CR 50(a), and Sedgley only makes arguments with respect to testimony from her witnesses.

[8] Sedgley's brief implies that Dr. Patel statedthat someone in the ER, presumably a nurse, was involved in the transmission of Randall's blood test result. Br. of Appellant at 43. This misrepresents the record. Sedgley's counsel made this statement. Dr. Patel's response was to what the proper response to a critical blood culture test was, not a confirmation that a nurse "presumably" handled Randall's test results.

standards. They were simply not followed. It began well in the lab when the lab technician contacted the ER staff and had a -- a readback, verbalized, confirmation. After that, it just -- essentially, they dropped the ball." RP at 1168.

Sedgley asserts that this testimony applied to all nurses and emergency room staff. But on cross-examination, Dr. Patel confirmed that the only nurse he provided a standard of care criticism toward was Olson. He also confirmed that he was not providing an expert opinion on the standard of care with respect to how any pharmacist followed the critical results policy.

Sedgley argues that the use of "they" in Dr. Patel's testimony indicates that some unidentified nurse breached the standard of care with respect to the critical results policy. But this testimony did not expressly state that an unidentified nurse breached the standard of care with respect to the critical test results policy. And Dr. Patel confirmed that his only opinion was that Olson breached the standard of care.

Sedgley suggests that some nurse other than Olson could have received the critical test results. But this is speculation. Although it is possible that some other nurse received the results, nobody testified that another nurse in fact received the results or was negligent.

Even viewing the evidence in the light most favorable to Sedgley, her expert testimony failed to establish that an unidentified PeaceHealth nurse breached the standard of care with respect to the critical test results policy. Therefore, we hold that the trial court did not err in granting PeaceHealth's CR 50 motion for judgment as a matter of law.

G.    WAIVER OF APPEAL – DR. ISAKOVIC

Dr. Isakovic argues that Sedgley waived any appellate argument with respect to her claim against Dr. Isakovic because she does not assign error to any trial court decision impacting her claim against him. We agree.

RAP 10.3(g) states, "The appellate court will only review a claimed error which is included in an assignment of error or clearly disclosed in the associated issue pertaining thereto." Based on RAP 10.3(g), we typically do not review a claimed error not included in an assignment of error. *See Phillips v. Greco*, 7 Wn. App. 2d 1, 9, 433 P.3d 509 (2018). "[A]n appellate court must not adjudicate resolved claims that are separate and distinct from the underlying disputes actually raised on appeal." *Clark County v. W. Wash. Growth Mgmt. Hearings Rev. Bd.*, 177 Wn.2d 136, 147, 298 P.3d 704 (2013).

Sedgley assigns error to four trial court rulings: (1) granting partial summary judgment to PeaceHealth on Sedgley's corporate negligence claims, (2) granting PeaceHealth's CR 50 motion for judgment as a matter of law with respect to unidentified PeaceHealth employees, (3) excluding Dr. Langman's trial testimony and Dr. Coralic's rebuttal testimony as a discovery sanction, and (4) redacting TEAMS messages before the jury and precluding Dr. Coralic from testifying in Sedgley's case-in-chief.

Sedgley's first and second assignment of error do not implicate her claim against Dr. Isakovic. Sedgley's corporate negligence claim is specific to her claim against PeaceHealth. And Dr. Isakovic was an identified PeaceHealth employee, so resolution of the second assignment of error does not impact Sedgley's claim against him.

Sedgley's third assignment of error also does not implicate Dr. Isakovic. In her brief, Sedgley states that Dr. Langman's testimony, if admitted, would have shown that Dr. Wilson negligently misdiagnosed Randall. Her brief does not argue that Dr. Langman's testimony would have impacted her claim against Dr. Isakovic. And Dr. Coralic was a pharmacist who provided expert opinion on the standard of care for pharmacists. Therefore, Sedgley's third assignment of error does not impact her claim against Dr. Isakovic.

Sedgley's fourth assignment of error contains two arguments. Her claimed error with respect to Dr. Coralic's testimony during her case-in-chief does not impact her claim against Dr. Isakovic for the same reason stated above: Dr. Coralic only would have testified to the standard of care for pharmacists and that testimony would not impact her claim against Dr. Isakovic.

Sedgley's fourth assignment of error argues that the trial court erred when it excluded the March 8 TEAMS messages between Dr. Cooper and Okerson as evidence. Specifically, she argues that the March 8 TEAMS messages were relevant evidence to show that (1) ciprofloxacin was the incorrect antibiotic to prescribe, (2) Randall should have received intravenous antibiotics, (3) Dr. Wilson fell below the standard of care by not prescribing the correct antibiotic for a middle ear infection, (4) PeaceHealth's emergency department did not follow its critical lab results policy, and (5) Dr. Cooper breached the standard of care by not communicating Randall's blood culture test results quickly enough.

None of these arguments relevant to the fourth assignment of error impact Sedgley's claim against Dr. Isakovic. First, Dr. Isakovic prescribed ciprofloxacin after consulting Dr. Wilson for his expertise in otolaryngology. Therefore, any breach of the standard of care would arise from Dr. Isakovic's consultation with Dr. Wilson or Dr. Wilson's recommendation of ciprofloxacin, not Dr. Isakovic's prescription of ciprofloxacin specifically. Second, there was no evidence that Dr. Isakovic participated in any failure of the critical results policy because he was the person to whom the results would have been conveyed. Sedgley's remaining arguments do not implicate Dr. Isakovic.

In her reply brief, Sedgley argues that the TEAMS messages would have bolstered her argument that Dr. Isakovic breached the standard of care by sending Randall home instead of admitting him to the hospital. But we do not consider arguments raised for the first time in a

38

reply brief. *State v. Eyman*, 24 Wn. App. 2d 795, 814, 521 P.3d 265 (2022), *review denied*, 1 Wn.3d 1021 (2023).

Because none of Sedgley's assignments of error impact her claim against Dr. Isakovic, Sedgley does not appeal the trial court's judgment with respect to Dr. Isakovic. Therefore, we hold that Sedgley waived any claims on appeal with respect to Dr. Isakovic.

H. CUMULATIVE ERROR

Because we reject all of Sedgley's arguments, we reject her claim of cumulative error.

CONCLUSION

We affirm the final judgment of the trial court dismissing Sedgley's claim with prejudice.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
MAXA, J.

We concur:

_____
CRUSER, C.J.

_____
CHE, J.